M'Elderry, et al. vs. Flannagan's Adm'r.—June, 1827.

The jury alone are competent to decide on facts of which contradictory evidence may be offered   Before the court can legally give an instruction to the jury, on the prayer of one of the parties, they must admit the truth of the testimony offered by the other, and that also offered by the first, which may operate in his opponent's favour, and the existence of all material facts reasonably deducible therefrom, even though contradicted in every particular by the testimony of him who seeks the instruction.   Upon no other principle can the case be withdrawn from the consideration of the jury.

Where the extent and limits of property leased are not exactly defined by the contract under which a tenant took possession, and in an action to recover the rent, the tenant relied upon an eviction of part of the demised premises by a third person claiming under his landlord, as bar to its payment, the jury should look to all the facts in evidence, and from them determine the limits of the tenant's lease, and whether there was an eviction or not.

Where a landlord having leased property to one tenant, subsequently leases a part of the same to another, the first is under no obligation to resist the second by force in taking possession; and notice by the first to the second tenant, (after a distress levied by the landlord on the former,) that he should consider him his tenant, is nugatory and inoperative.

Joint property in the possession of one of the owners, may be seized and sold under a *fieri facias* against him only; and the purchaser's right would be complete to the extent of the interest of him against whom the execution issued, and he might hold accordingly.

Where F, a ship-carpenter, contracted with C to build him a sloop, for which C was to pay as the work advanced, and furnish all the materials and labour except what appertained to the ship-carpenter's work, the vessel being in F's possession, not entirely paid for, and nearly finished, was levied on by the landlord of the ship-yard as a distress for rent— *Held*, that F had an interest in the vessel to the extent of his carpenter's work *not then paid for*, liable to seizure and sale on process for the recovery of debts, or rent due by him.

One joint owner of a chattel cannot maintain replevin against another.

Appeal from *Baltimore* County Court.   Replevin by the appellee against the appellants for a sloop or vessel on the stocks, taken in a certain place called The *Ship Yard* of the plaintiff. The defendants avowed the taking, &c. for two years rent in arrear of the lands and tenements in which, &c. under a demise thereof made by the defendants to the plaintiff's intestate, on the 18th of August 1813, at the yearly rent of $600; and because $1200 were due for two years, &c. well avows the taking, &c. for and in the name of a distress for the said rent, &c. The plaintiff pleaded to the avowry—1. That the plaintiff's intes-

tate did not hold or enjoy the said place in which, &c. as tenant thereof to the avowants under the supposed demise thereof, &c. 2. That no part of the supposed rent was or is in arrear, &c. Issue tendered. 3. That the said place in which, &c. was parcel of a close which the plaintiff's intestate held as tenant to the avowants a long time before the time when the said distress was made; and that the avowants, a long time before the time at which the said distress was made, and before the time at which the supposed rent for which the said distress was and is pretended to have been made, or any part thereof, was supposed or pretended to be due, entered wrongfully into the said close, and put out the plaintiff's intestate from a great part thereof, &c. 4. That the plaintiff's intestate was a ship-carpenter, and that the said place, in which, &c. was occupied by him as a common and public ship-yard for the building and repairing of ships and other vessels; and that the said goods and chattels were the property of one *William Carman*, and were a certain sloop or vessel upon the stocks and unfinished, and at the time of the said distress was in the possession of the plaintiff's intestate in the said public ship-yard, in the ordinary course of his trade as a ship-carpenter, for the purpose of being built and finished, and for no other purpose, and that the plaintiff's intestate had no property therein except as bailee as aforesaid of the said *Carman*, &c. The defendants joined issues to the *first* and *second* pleas. To the *third* plea they replied, that they did not, before the time at which the distress was made, and before the time the said rent was due, enter wrongfully into the said close, and put out the plaintiff's intestate, &c. Issue joined. To the *fourth* plea they replied, that the said goods and chattels were not the property of *William Carman*, and the sloop or vessel was not, at the time of the distress, in the possession of the plaintiff's intestate, in his public ship-yard, in the ordinary course of his trade, &c. and and that he had property therein. Issue joined.

1. The avowants, at the trial, gave evidence, that in the year 1810, *William Flannagan*, the plaintiff's intestate, rented of *Thomas M'Elderry*, under whom the defendants claim, part of the property, for the rent of which the distress was laid in

this cause, at the rent of $500 per annum, and afterwards rented another part of said property at the additional rent of $200 per annum; and that the property thus rented extended from, &c. That afterwards *Flannagan* on the 18th of August 1811, rented by parol of the defendants the whole property from *A*, round to *N*, for five years, for $1200 per annum. That after *Flannagan* had enjoyed the same for somewhat more than one year, the avowants having received a proposition for the renting of the wharf from *I* to *M*, called upon *Flannagan* and asked him if he would give up a part of said wharf for a proper consideration, to enable them to make a lease in perpetuity to *Martin F. Maher;* that *Flannagan* in July 1813, agreed that the avowants should lease to *Martin F. Maher* a part of said property called the *New Wharf*, as described in the lease to them; and that he, *Flannagan*, should rent the residue in his possession at the rate of $600 per annum; and that *Flannagan* enjoyed the property from *A* to *I* for two years next after this 18th of August 1813, and until the time of the distress which was laid by the defendants. And the avowants further proved, that immediately upon said agreement the avowants executed the following lease to said *Maher*, dated the 29th of July 1813, for all that lot, piece or parcel of ground, situate, lying and being in the city of *Baltimore*, and contained within the following metes and bounds, courses and distances, to wit: Beginning; &c. To have and to hold, &c. for 99 years, at the yearly rent of $2125, with the usual covenants to pay the rent, and liberty to re-enter on nonpayment, &c. Which lease extends from *I* to *M;* and that *Flannagan* having some timber on said part so leased to *Maher*, he removed the same from off said lot when requested so to do; and that *Flannagan* was present and saw the improvements made by *Smith* and *Maher* on the whole of said lot, and never objected to the same. That *Maher* paid rent to the avowants for his part of said lot up to the time of laying the distress in this case, and was never forbidden so to do by *Flannagan*. And that after the said lease was made by the avowants to *Maher*, the front of which, from *I* to *M*, was lying on the navigable waters of the Basin of *Baltimore*, *Maher* applied to the port wardens of *Baltimore* for permission to drive the piles from *H* to *N*, which

permission was granted to him by said port wardens, and that said piles were not driven by the direction or authority of the avowants, or either of them; and that during all the holding of *Flannagan* there was a chained moveable floating log fixed with one end to *H*, and the other on the piles, long enough to permit vessels and timber to come to the wharf from *H* to *I*, this log serving as a door for that purpose, and that there never was a period during the whole of said renting by *Flannagan*, in which there was not ample room on the other part of said demised premises, at which he might land lumber or carry in vessels, those being the only two purposes for which said wharf was requisite. The avowants further gave in evidence, by one *Daniel Conn*, a competent witness, that after the two years rent became due, which are in controversy in this cause, he went with Mrs. *M·Elderry*, one of the avowants, and one of the lessors of *Flannagan*, to *Flannagan*, to require of him the payment of said two years rent. That they saw *Flannagan*, who objected to pay it, but that nothing was said about any other rent than that now in dispute. The plaintiff, in order to support the *third* issue on his part, gave in evidence, that *William Flannagan*, the original plaintiff in this cause, some time prior to the year 1810, held as tenant to *Thomas M'Elderry*, deceased, whose heirs at law the defendants are, at the annual rent of $500, a portion of the property known by the name of *M'Elderry's Wharf*, beginning for the water front of said portion of property at the point marked *A* upon the plot hereunto annexed, and running thence southerly to *B*, and thence round to *O*; that one *Ludwig Herring* occupied under the said *Thomas M'Elderry*, and as his tenant, about 80 feet front, or thereabouts, lying immediately north of the point *A*, and that one *Salisbury* occupied the lower end of the wharf; that at that time the wharf extended as far south as the line *H I R*; and that there was also an unfinished wharf projecting southwardly from the line *I R*, about 60 feet; that *Salisbury* occupied the whole lower end of the wharf, including the said unfinished wharf or projection, and the water right in front thereof, and of the line *H I*. That by a contract made between the said *Thomas M'Elderry* and *Flannagan*, sometime in 1810, the said *M'Elderry* demised to *Flannagan* the whole

of said wharf property, which had been rented both by *Flan-
nagan* and *Salisbury*, at the annual rent of $700. That subse-
quent to the said last mentioned demise the wharf was extend-
ed to its present limits, as laid down upon the plot, southward-
ly from the termination of the old wharf to the point *M* and
*N.* That after the said extension, the defendants, who had
then succeeded to the property upon the death of *Thomas*
*M'Elderry*, whose heirs at law they are, demised by parol, to
*Flannagan*, the whole of said wharf property beginning at *A*
round to *N*, at the annual rent of $1200 for five years, com-
mencing on the 18th of August 1811. That on the 29th of
July 1813, the defendants leased to *Job Smith*, and others, at
the annual rent of $2125, all that part of the wharf which is
south of the line *H I R*. That *Smith*, and others, entered and
took possession of the part of the wharf so leased, and drove
piles in the place indicated by the dotted curved line from *H*
to *N*, to the utter destruction of that part of the wharf called
the *South Cross Wharf;* that is to say, that part of the wharf
from *H* to *I.* That the said piles, and the occupier of the
west front wharf running southerly from *I* to *M* by the said
last mentioned lessees, not only deprived *Flannagan* of the
use of all that part of the property south of the line *H I R*,
but rendered the south front wharf from *H* to *I* of no use or
value to *Flannagan.* That the said south front wharf had
previously been of great importance to *Flannagan.* That
*Flannagan* was a ship-carpenter, and that the said south front
wharf was, on account of its situation in relation to the part,
particularly adapted for the purpose of heaving down vessels,
and was employed by *Flannagan* for that purpose; one large
brig was actually hove down at the said south front wharf. Af-
ter the said lease from the defendants to *Smith*, and others, no
vessel could be hove down at said south front wharf, as well on
account of the driving of the piles aforesaid, as of the occupa-
tion of the west front wharf, running southwardly from *I*, by
the said last mentioned lessees. The plaintiff further proved
by *William Carman*, a witness sworn in the cause, that in
the month of March 1813, the defendants leased to the witness
100 feet of ground for 99 years, renewable for ever, at the rate
of five dollars per foot per annum, by deed dated the 8th of

March 1813, and which was executed by *Elizabeth, John* and *Thomas M'Elderry*, in virtue of an act of assembly appointing them trustees, &c. to *William Carman, James Mosher* and *Robert Carey Long*, in the proportion of one undivided half to *Carman*, one undivided fourth to *Mosher*, and the remaining undivided fourth to *Long*, &c. And that in pursuance of, and by authority of said lease, the witness entered into the said 100 feet of ground, and began to remove some lumber and timber belonging to *Flannagan* from off the same, and to dig, the foundation for an office. That while so removing said timber and lumber, and digging said foundation, *Flannagan* came to witness and told him he was encroaching on the grounds leased to him, *Flannagan*, by the defendants. That witness replied that he did not know how that was; that he had a lease of the ground, and that he, *Flannagan*, would have to settle it with the defendants. That the witness proceeded to remove, and did remove the lumber of *Flannagan* from off the ground, and dug the foundation, and built a brick office thereon, and enclosed the whole of said 100 feet of ground by a fence. The plaintiff further proved, that 16 feet of the 100 feet leased by the defendants to *Carman*, (from which 16 feet *Carman* removed the lumber and on which he built the office as before stated,) was part of the ground originally leased by *Flannagan* from the defendants; and that *Carman* has continued to hold the said 16 feet under and by virtue of the authority of his lease aforesaid, ever since, and held the same as aforesaid during the time in which the rent in this case is alleged to have accrued. The avowants then proved, that about the time of the lease to *Carman*, he proceeded to erect a brick shop on said 16 feet, and proceeded to remove some of *Flannagan's* lumber which was lying thereon; that *Flannagan* came and at first objected to it, but that *Carman* told him he had leased of *M'Elderry*, and then proceeded to remove the lumber, *Flannagan* standing by and seeing its removal without making any further objections; and that *Flannagan* never did object afterwards to the erection of said office, until the quarrel arose in 1816, and he sent *Carman* notice that he should consider him his tenant. The plaintiff then moved the court to direct the jury, that if they shall

believe the lease from the defendants to *William Carman*, as given in evidence, included a part of the ground to which *Flannagan* was entitled under his lease from the defendants of the 18th of August 1811, and that *Carman*, by virtue of his lease, entered upon such part, and thereby excluded *Flannagan* from the possession thereof, without his consent and against his will, then such entry and exclusion suspended the legal right of the defendants to demand rent from *Flannagan* for the whole or any part of the property so leased to him, as long as *Flannagan* was deprived of the possession of that part so leased and occupied by *Carman*, and included in the lease from the defendants to *Flannagan* as aforesaid. Which opinion and direction the Court, [*Archer*, Ch. J.] gave. The avowants excepted.

2. The preceding evidence having been given, the avowants made the three following prayers to the court: 1st. If the jury should believe from the evidence, that on the 18th of August 1813, the date of the lease from the avowants to *Flannagan*, upon which was reserved the rent of $600, *Flannagan* knew that *Carman* claimed, and had taken possession of, under his lease from the avowants, of the 16 feet lying between the lines on the plot from *A* to, &c. that then they may presume that said 16 feet were not intended to be included in the lease aforesaid to *Flannagan*. Which direction the court refused to give; but informed the jury that they should look to all the facts in evidence, and from them determine the extent and limits of the lease to the plaintiff. 2d. If the jury believe from the evidence, that after *Carman* took possession of the 16 feet marked on the plot, *Flannagan* did not apply to the avowants in relation to said possession, but afterwards gave *Carman* notice to pay the rent of said 16 feet to him, *Flannagan*, that then *Flannagan* elected to take *Carman* as his tenant, and that his so doing prevents said possession from amounting to an eviction of *Flannagan* from the property held by him from the avowants. 3d. Upon all the evidence and pleadings in this cause, the avowants prayed the court to instruct the jury, that they are entitled to recover. Which direction the court refused to give. The avowants excepted.

3. The plaintiff, in order to support the *fourth* issue on his part, gave in evidence that *William Carman*, mentioned in the *fourth* plea of him the plaintiff, agreed with *William Flannagan*, the original plaintiff in this cause, that he, *Flannagan*, should build for him, *Carman*, a sloop, for which *Carman* was to pay as the work advanced. That *Flannagan* accordingly built a sloop for *Carman*, and that *Carman* paid to *Flannagan* money on account of the said sloop. That on the 27th of February 1816, the captain employed by *Carman* to command said sloop, commenced superintending the said sloop, and did actually superintend and work on board her, and that his wages commenced from that day, she then being upon the stocks. That the said sloop was intended to be launched upon the 1st of March 1816, about 12 o'clock at noon; that about 10 o'clock, A. M. on the said 1st of March, the defendants distrained the said sloop; that in the course of the day she was replevied, and was actually launched about 5 o'clock, P. M. of the same day. That previous to the distress, *Carman* had paid to *Flannagan*, for and on account of the said sloop, and in pursuance of the contract for building her, the sum of $1,450. That at the time of the distress the mast of the said sloop was in her, and she was as much rigged as she could be previous to launching. That the joiners' work was all done; that she was painted and varnished. That there was much blacksmiths' work done upon her. That *Flannagan* had nothing to do with the rigging, joiners' work, blacksmiths' work, painting or varnishing the said sloop; but that the same were to be paid for by *Carman*. That there were other workmanship and materials employed in and about the said sloop before the said distress, for which *Carman* had paid, or was responsible, and which were finished by persons other than *Flannagan*, and with which *Flannagan* had nothing to do. That *Carman* had paid, and was responsible for the sum of $710, and upwards, for the workmanship and materials furnished and employed in and about the said sloop, by persons other than *Flannagan*, and with which he, *Flannagan*, had nothing to do. That *Flannagan* was a ship-carpenter; and that the place where the distress was made was his ship-yard. The defendants, to support the said issue on their part, gave in evindence,

that there was due to *Flannagan*, on account of the said sloop, the sum of $333 66. · That the contract between *Carman* and *Flannagan* was that *Flannagan* should furnish all the materials for his work on said vessel, and should finish the said sloop to a cleat.    That the meaning of said contract, as understood by merchants and ship-carpenters, is that the whole of the ship-carpenter's work shall be done; that it is part of the ship-carpenter's work to launch the vessel, which is a difficult and dangerous operation, and until it is over, vessels are always considered at the risk of the builder.    That said vessel was only measured, and her tonnage ascertained, after she was launched; and that said distress was levied whilst said vessel was on the stocks, and before the carpenter's certificate was given for her; and it is quite usual for captains of vessels to superintend the building and equipping of vessels whilst on the stocks.    The defendants then prayed the court, that upon the foregoing evidence, the plaintiff was not entitled to recover.    Which opinion the court refused to give.    The avowants excepted.    Verdict and judgment for the plaintiff; and the defendants (the avowants,) appealed to this court.

The cause was argued at the last June term before BUCHANAN, Ch. J. and STEPHEN, and DORSEY, J.

*R. Johnson*, for the Appellants, contended upon the *first* bill of exceptions, 1.    That admitting *Carman*, under his lease of the 8th of March 1813, took possession of 16 feet of the whole ground originally leased by the appellants to *Flannagan*, such possession did not in law amount to an eviction of *Flannagan* by the appellants, of those 16 feet, so as to extinguish their right to the rent.

2.    By the evidence, *Carman's* possession under his lease of the 8th of March 1813, of the 16 feet, was before the lease stated in the avowry from the appellants to *Flannagan* of the 18th of August 1813, and did not interfere with *Flannagan's* enjoyment under his last lease, of any part of the property embraced by it; and, therefore, did not operate to suspend or extinguish the appellants' right to the reserved rent.

3.    Upon the *second* bill of exceptions he contended, that the notification by *Flannagan* to *Carman*, after the date of

*Carman's* lease from the appellants, operated to make *Carman* an under-tenant of *Flannagan*, and to prevent that lease from having the effect of evicting *Flannagan* from any part of the property leased to him by the appellants, so as to suspend the right of the appellants to demand, under the last lease, their rent from *Flannagan.* Upon the *first* and *third* prayers in this bill of exceptions, no question will be raised.

4. On the *third* bill of exceptions, he contended, that the form of this exception admits the lease stated in the avowry, and that the rent was due at the date of the distress, &c. 1. That as *Flannagan* continued in possession of the property distrained at the time of the distress, he had such an estate in the property as rendered it liable to distress. 2. That if he had not such an estate, it was because he had parted with his possession, in which event he had neither a general nor special property in the vessel distrained, and could not, therefore, as is the prayer in this exception, maintain this action for the vessel.

On the *first* and *second* points, he cited *Clayton vs Blakey*, 8 *T. R.* 3. The act of 1766, *ch.* 14. *Laidler vs Young's Lessee*, 2 *Harr. & Johns.* 69. 4 *Bac. Ab.* tit. *Leases*, &c. (S 3,) 212.

On the *fourth* point, he cited 3 *Blk. Com.* 7. *Zagary vs Furnell*, 2 *Campb.* 240. *M'Donald vs Hewett*, 15 *Johns. Rep.* 349. *Allegre vs Maryland Insurance Company*, 6 *Harr. & Johns.* 408. *Mucklow vs Mangles*, 1 *Taunt.* 318.

*Wirt*, (Attorney General of *U. S.)* *Meredith* and *Evans*, for the Appellee. Upon the *first* bill of exceptions they contended, that an eviction of part of the land demised suspended the whole rent. 3 *Bac. Ab.* tit. *Extinguishment*, (A) 105. 6 *Bac. Ab.* tit. *Rent*, 49. *Co. Litt.* 148. a. *Gilb. on Rents*, 178. *Eddowes vs Niell*, 4 *Dall. Rep.* 134. The entry of *Carman* was an eviction of *Flannagan;* and the act of *Carman* was the act of the appellants, his lessors. *Co. Litt.* 249, *(note.)* 317, *(note* 3.) *Freeman vs Barnes*, 1 *Vent.* 80. The lease to *Flannagan* was not a void contract under the statute of frauds, or the act of 1766, *ch.* 14. A parol lease from year to year for seven years, is not a lease for a year certain, but for seven years. *Rob. on Frauds*, 242, 243, *(note.)* *Legg vs*

*Strudwick*, 2 *Salk.* 414. *Birch vs Wright*, 1 *T. R.* 378, 381, per *Buller*, J.   A new lease of a part is no surrender of an old lease.   A surrender of part is no surrender of the whole. 6 *Com. Dig.* tit. *Surrender*, (I 2,) 320.   *Rob. on Frauds*, 258, 259, 261.   4 *Bac. Ab.* tit. *Leases*, 217.   3 *Bac. Ab.* 105. It is not a new lease of any part.   The avowry does not state what part was demised.   The *first* and *second* issues were found for the plaintiff without any direction from the court to the jury.   *Rob. on Frauds*, 244.   *Doe vs Bell*, 6 *T. R.* 471. As to the apportionment of rent—*Co. Litt.* 148.   *Com. Dig.* tit. *Suspension*, (E.)

On the *third* bill of exceptions.   A landlord has a right to distrain any property on the premises, excepting that placed there for public convenience, and the benefit of trade and commerce.   *Gilman vs Elton*, 7 *Serg. & Low.* 355   Here the property of sundry persons was taken as the property of one person.   The vessel taken was the common property of different mechanics—if she was not the property wholly of *Carman*.   He was responsible to the mechanics.   Take him as having a joint property with *Flannagan*, the distress was improper.   *Co. Litt.* 47.   But the whole property in the vessel was in *Carman*.   *Woods vs Russell*, 7 *Serg. & Low.* 310.   A mere right of possession is sufficient to maintain replevin. *Smith vs Williamson*, 1 *Harr. & Johns.* 147.

*Taney*, in reply.   Three questions arise under the *third* bill of exceptions on the fourth issue.   1. Was the right of property in the vessel in *Flannagan* or *Carman?*   2. If in *Carman*, was she liable to distress?   3. If not liable, had the plaintiff such a property in her as could support replevin?

1. The contract was for building the vessel.   *Carman* had the right of action to claim the property, but the right continued to reside in *Flannagan*.   A right under a contract, and a right of property, are two different things.   If any thing is to be done to the thing contracted for, it is the right of the vendor, and not the right of the vendee.   Until the vessel was launched she was the property of *Flannagan*—not as bailee.   The risk was *Flannagan's* if the vessel was destroyed in launching, &c. *M'Donald vs Hewett*, 15 *Johns. Rep.* 349.   *Woods vs Rus-*

*sell,* 7 *Serg. & Low.* 310. A person mixing his property with another's is to abide the consequences resulting therefrom. It cannot exempt the property from distress for rent.

2. The property was not privileged from distress. *Gilman vs Elton,* 7 *Serg. & Low.* 357.

3. The prayer in the *third* bill of exceptions went as to the *fourth* issue, and was intended to apply to that issue only, although it was general.

On the *first* bill of exceptions. The eviction is not under the lease to *Maher,* but under the lease to *Carman.* The other leases have nothing to do with the case. The lease to *Flannagan* commenced in August 1811. In July 1813, *Flannagan* agreed to the lease to *Maher.* The 16 feet were not then in his possession. The new lease by parol was in 1813, for a rent of $600 per annum. An eviction suspends the rent from the time of the eviction. By the Statute of Frauds all leases for more than three years were leases at will. (See the statute in 1 *Bac. Ab.* tit. *Agreement,* (C) 115.) If the lease is for five years, that would be a tenancy from year to year, so long as the parties agreed. This is the case in *England.* But our act of 1766, *ch.* 14, declares that leases for above seven years shall be recorded; but it left all leases for seven years, and under, as they stood before, and did not repeal the law as to such leases. The effect of a lease from year to year, is a lease for a single year. Looking back for several years they are united, and it is a continuing contract; but looking forward it is only a lease for a year. If a lease is for three years, and the term has expired, the lessor could not distrain at common law. *Rob. on Frauds,* 241. The eviction by *Carman* was on the 13th of March 1813. What was *Flannagan's* interest at that time? His right then expired in August 1813. The agreement between him and the appellants was a new lease after August 1813, so that no rent could be exacted which fell due in August 1813, because of the eviction. But that eviction could not operate upon the new lease, which commenced in August 1813, at the expiration of the former lease. When he was evicted he had no interest. He got a new interest under the new lease. *Rob. on Frauds,* 242, *(and note.)* Here it cannot be presumed that the 16 feet

were included in the new lease, because they had been leased to *Carman.* An agreement to continue must be the act of both parties. Under the new lease *Flannagan* never was in possession, nor was to be, of the 16 feet leased to *Carman.* The presumption of a continuing lease is where the whole property remains in the possession of the tenant. The lease to *Carman* for the 16 feet was notice to *Flannagan.* Acceptance of a new lease for a part, is a surrender of the old lease as to all except that part. 4 *Bac. Ab.* 212, 217.

*Curia adv. vult.*

DORSEY, J. at this term, delivered the opinion of the court. The correctness of the opinion given by the county court on the *first* bill of exceptions, depends entirely on the existence of a fact, of which, to view it in the aspect most favourable to the appellee, there is considerable doubt. By the demise of the 18th of August 1811, *Flannagan* held of the appellants, by parol, for five years, the whole of the wharf property alluded to in any part of the proceedings in this cause. On the 8th of March 1813, the appellants leased to *William Carman* a part of it fronting 100 feet on the water; and on the 29th of the succeeding July, by the consent of *Flannagan,* made a lease of that part of said wharf called *The New Wharf,* to *Martin F. Maher,* for 99 years renewable forever; and according to the testimony of the appellants, as stated in this bill of exceptions, he, *Flannagan,* agreed to rent the residue of said wharf *in his possession,* at the rate of $600 per annum. Whether, in the opinion of the court, according to the weight of testimony, this contract of July 1813, is to be considered as a surrender of all those parts of the wharf only which were leased to *Maher,* and an apportionment of the rent for the residue, or as a surrender of the whole wharf, and an acceptance by *Flannagan* of a new lease of all that part of the wharf not included in *Maher's* lease, is wholly immaterial in deciding on the prayer made to the county court. Before the court could legally give the instruction prayed for by the appellee, they must admit the truth of the testimony offered by the appellants, and of the testimony given by the appellee, which may operate in the appellants' favour, and the existence of all material facts

reasonably deducible therefrom, even though contradicted in every particular by the testimony on the part of the appellee; Upon no other principle can the case be withdrawn from the consideration of the jury, who alone are competent to decide on facts of which contradictory evidence may be offered. The agreement of the 29th of July 1813, as proved by the appellants, is therefore a *concessum* in the cause. If there were no proof to show that the possession of *Carman's* lot was out of *Flannagan* at the time of that agreement, then were the court below justified in the opinion they have given. But if there be evidence from which a rational mind could infer such a fact, the county court have invaded the province of the jury, and their judgment must be reversed. The proof on the part of the appellee, is that *Carman,* in pursuance of his lease, entered upon his 100 feet of ground, erected a shop on 16 feet thereof, and enclosed the whole with a fence. The appellants prove that this was done about the time of the lease to *Carman.* When this testimony is coupled with the agreement of the 29th of July 1813, in which the word *possession* is used, for no other purpose that is discernible, unless it be to exclude from the demise to *Flannagan* the lot leased to *Carman,* can it be said that there is no evidence admissible to the jury to show possession in *Carman* at the time of such agreement? He who would refer to the case of *Ludlow vs Ogdon,* 2 *Wheat.* 178, (which however it must be admitted extends the power of a jury to the utmost verge of rationality,) would not hesitate in returning a negative answer to this question.

The *second* bill of exceptions presents the several prayers on the part of the appellants, all of which were refused by the court. In the decision on the *first* and *third* the counsel of the appellee have stated their entire acquiescence; and of that made on the *second* there is as little cause of complaint. Whether there was an eviction or not depends upon all the circumstances of the case, and not upon the two isolated facts which have been selected as the basis of the prayer. *Flannagan* was not bound to resist by force the acts of *Carman* in taking possession of the lot demised to him, and his notifying *Carman,* after the distress was levied, that he should consider him his tenant, did not make him so, or release him from his

covenants to the appellants; and upon no principle of law or justice should an act so nugatory and inoperative be construed to divest *Flannagan* of an unquestionable legal right.

The only question designed to be raised by the *third* bill of exceptions is, whether *Flannagan* had such an interest in the sloop, as could be the subject of a distress for rent. By the refusal to give the instruction demanded by the appellants, the court below have determined, that such a distress was unlawful; and from this decision an appeal has been wisely taken. Even let it be conceded that all the materials and work of the blacksmith, the ship-joiner, the painter and rigger, were the general property of *Carman*, and that he had a like interest in the materials and workmanship of the carpenter to the extent of his payments made on the sloop, and also that the shipyard of *Flannagan*, for reasons of public policy, and for the encouragement of commerce, protects from distress the property of third persons, placed there in the ordinary course of business; yet is it not a proposition equally undeniable, that *Flannagan* had the same property in his materials and labour on the sloop, to the extent of the balance due to him therefor? The privileges of his ship-yard cast around his interest no protection, and it remained liable to distress in the same manner that his separate property would have been. Joint property, in the possession of one of the owners, may be seized and sold under a *fieri facias* against him only, and the purchaser's right would be complete to the extent of the interest of him against whom the execution issued; and he might hold possession accordingly. In the present case, if under the Stat. of 17 *Car.* II, ch. 7, the jury be required by the appellants to ascertain the amount of property distrained, they must have limited its value to the balance due from *Carman* to *Flannagan;* and if declining to proceed under this statute, a general judgment for a return had been rendered, *Carman*, by application to a court of equity, would have recovered the sloop, upon his paying to the purchaser the balance due for it according to his contract.

*Flannagan's* interest being adjudged distrainable, his right to maintain replevin as the bailee of *Carman*, so much relied on in the argument, necessarily falls to the ground—one joint owner of a chattel being incompetent to maintain replevin

against another.   And upon no principle can the rights of the bailee, in such a case, be extended beyond those of his principal.

The case of *Woods vs Russell,* 5 *Barn. & Ald.* 942, urged by the appellee's counsel as conclusive upon the case before us, is clearly distinguishable from it.   Here no act was done by *Flannagan* which could be tortured into an admission that the entire property in the sloop should pass to *Flannagan,* but upon the payment of the whole price stipulated to be paid for her.   There the ship-builder was privy to the chartering of the ship by him for whom she was built, assented to the measurement thereof, and gave the usual certificate of building, &c. to authorise the granting to him a register, which issued accordingly, and could only have been obtained by making an affidavit of ownership.   These facts create an irresistible implication, that the builder consented that the general property in the ship should be considered from that time as being in the defendant.   And in that light were they viewed by the court.

The rights of the party, for whom any article is built agreeably to contract, is very strongly marked out in *Mucklow vs Mangles,* 1 *Taunt.* 318.   *Royland* contracted to build a barge for *Pocock,* and received from time to time, as the work proceeded, £190, the value of the barge.   When it was nearly completed, *Pocock's* name was painted on the stern.   *Royland* became bankrupt before its completion.   The court held that the barge was not the property of *Pocock* until finished; that it was a quite different thing from a contract of sale.   And *Lawrence,* Justice, stated that no property vested, till the thing is finished and delivered.   Such a general rule, though applicable to the case in which it was pronounced, would be productive of much inconvenience, and great injustice, if applied to the facts before us.   There the contract was simply to build the barge.   No agreement to pay the stipulated price as the work proceeded—nothing to specify the particular barge to which the contract or money paid should attach—nothing by which its identity could be ascertained.   The delivery of any other barge would have been strictly a compliance with the contract.   Not so here; the sloop was to be

paid for "as the work advanced," all the materials and labour, except what appertained to the ship-carpenter's work, were to be furnished and paid for by *Carman.* The contract, there-fore, attached on and identified that particular sloop; the de-livery of no other would have been by *Flannagan* a perform-ance of his contract. *Carman* had, therefore, at the time of the distress, a general property in the sloop equivalent to the money paid, and labour and materials by him found on account thereof, but no further. The residue of the property therein remained in *Flannagan,* liable to seizure and sale, on process for the recovery of debts or rent due by him; and by no pro-ceeding in a court of law could *Carman* recover possession of the sloop until payment, or tender of payment, of the whole price specified by the terms of his contract.

The opinion given by the county court on the *second* bill of exceptions is assented to; but that delivered by them on the *first* and *third* bills of exceptions is dissented from.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED