ELLA BURKE

*vs.*

THE MAYOR AND CITY COUNCIL OF BALTI-
MORE, A BODY CORPORATE;
SINGER-PENTZ COMPANY, A BODY CORPORATE;
ALTON T. NICHOLS AND HARRY M. NICHOLS,
CO-PARTNERS, TRADING AS NICHOLS BROTHERS.

*Negligence: suits for damages; burden of proof; taking case
from jury; duty of court; weight of evidence. Municipal
corporations: duties; streets and markets.*

In negligence cases, it is the duty of the court to decide, as a
preliminary legal question, whether there be any evidence legally
sufficient to be considered by the jury; and the criterion is
whether the evidence of the plaintiff is of sufficient probative
force to enable an ordinary intelligent mind to draw rational
conclusions therefrom in support of the proposition advanced.
                                                                    p. 561

If any evidence is competent and pertinent, its weight and
value should be left to the consideration of the jury.      p. 561

Before the court can grant a prayer taking the case away
from the jury, it must assume the truth of all the evidence tend-
ing to sustain the claim or defense, as the case may be, and all
inferences of fact fairly deducible therefrom.              p. 561

It is the duty of a municipality to keep the approaches to
the public markets, as well as its streets and highways, in a safe
condition for public travel.                                p. 562

If Baltimore City negligently fails to do so, and persons, acting without negligence, are injured, the city is liable in damages for the injuries caused by its neglect. p. 562

Direct proof of negligence is not necessary, but, like other facts, may be established by proof of circumstances from which its existence may be inferred. . p. 563

*Decided January 14th, 1916.*

Appeal from the Court of Common Pleas. (DAWKINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Isaac Lobe Straus* (with whom were *Morris & Morris* on the brief), for the appellant.

*James J. Carmody* and *Robert F. Leach, Jr., Assistant City Solicitor* (with *S. S. Field, City Solicitor,* on the brief), for the appellees.

*John S. Biddison* and *John B. Gontrum* filed a brief in behalf of Nichols Brothers, appellees.

BRISCOE, J., delivered the opinion of the Court.

This is a suit by the plaintiff to recover damages for personal injuries, alleged to have been caused by the negligence of the defendants.

The single question presented by the record is whether the evidence on the part of the plaintiff was legally sufficient to be submitted to the jury, to show negligence upon the part

of the defendants and that such negligence was the cause of the alleged injuries.

The Court below, by its instruction at the close of the plaintiff's case, withdrew the case from the consideration of the jury, and directed a verdict for the defendants, and the action of the Court in granting this prayer is the subject of this appeal.

The defendants below are the Mayor and City Council of Baltimore, the Singer-Pentz Company, a contractor of the City, Alton T. Nichols and Harry M. Nichols, trading as Nichols Brothers, sub-contractors.

The declaration, in substance, avers, that at the time of the injuries complained of, the Mayor and City Council of Baltimore was the owner and had under its control a public building known as the Richmond Market House, situate in the City of Baltimore, and at the time in question the defendants were engaged in repairing and remodeling the building and the surrounding pavements of the market house. That the plaintiff, on the 23rd day of May, 1914, while entering a doorway or entrance of the market, stumbled, fell and was thrown to the floor or pavement thereof by reason of the fact that the defendants had made an opening or trench in the concrete floor or pavement, the existence and location of which the plaintiff was unaware, and from which cause she received painful and permanent injuries and has been put to great expense for medical attention and care. That at the time of the injuries she was exercising due care and caution, but that the injuries she sustained were the direct result of the negligence, default and want of due care upon the part of the defendants, their officers, agents, employees and servants in allowing and permitting said opening or trench to remain for a long space of time without a covering or warning or signal of any kind or description, indicating to the plaintiff the existence and location of this opening or trench.          •

It appears that on the 3rd of January, 1914, the Mayor and City Council of Baltimore entered into a contract with the defendant, the Singer-Pentz Company, to erect an enclosure at the Richmond Market, one of the market places of the City.

The work or repairs involving the preparation of the foundation, concrete floors and pavement was sublet by the contractor to the defendant, the firm of Nichols Brothers.

Henry F. Nichols testified that Richmond Market was to be enclosed with an iron framework and iron sash with wire glass, and this iron framework was to set on a concrete base. It was six inches above the sidewalk and extended into the pavement four inches, and the doorways were to be a granite block base, and we were to bring the threshold up so that when the doors were closed it would admit as little air as possible. The preliminary part of the work consisted in digging this trench four inches deep, six inches wide around the entire market where the iron work was to be constructed. "This particular doorway was at the corner of the street; I think the corner may have a radius of about six feet, and the doorway was across the end of that curb, and it naturally extended further across the street than at other points, and I think this particular place anyway was from 12 to 16 inches * * * from the end of the curb or centre of the curb."

The witness further testified that after the excavation of the trench for the threshold, the work was held up, and they quitted work on the door where the accident happened, and left the work in charge of the Singer-Pentz Co.; that when they left the work, they refilled the trench with broken and loose concrete, and it was impossible for anyone to trip over it; but he did not see the trench again from April 24th to July 23rd, 1914, a period of three months. The trench was five feet long, six inches wide and four inches deep, and extended the width of the doorway.

The plaintiff testified that on the day of the accident she first entered the market at Howard and Richmond streets

for the purpose of paying some bills for a lady that she catered for, and then went out of the market by the middle door at the southwest corner of Linden avenue and Biddle street, to make some purchases. She then walked across the street in returning to the market, and, as she expressed it, "catacornered across the street to the corner door of the market, the end door that I went in with my biscuits and satchel."

She then further testified: "I had no other thought than to enter the doorway, to get into the market, and I remember getting up to the door in the front to the doorway.

"Q. Is there a curb or sill at this doorway? A. I think so. Q. Did you place your foot on that curb or sill? A. Yes. Q. Then what happened? A. Then I can't tell what happened, as I was pitched and I only remember for an instant of trying to—I knew I was being pitched and I tried for an instant to catch myself when I was pitched some distance and my head came across the stall like this (indicating) my forehead. Q. How far was that stall from the entrance to the door? A. I judge about four or five feet. Q. When you approached this doorway of the market was there any sign or any warning that would cause you to have seen this ditch? A. No; I didn't see any. Q. Was there a sign or a warning? A. No; I didn't see it. Q. What did you see as you approached the entrance to the market? A. The only thing I saw as I approached the entrance was the door. I didn't think to see anything. I simply came across the street with my one paper bag of biscuits and my satchel, and went to go into this door and when one foot was up in the door and the other foot I didn't know where it went, I was pitched. I really couldn't tell you anything except that my head struck this stall."

She testified upon cross-examination that it was about 1 o'clock in the day, and there was nothing to obstruct her view at the entrance to the market when she stepped from the curb to the doorway; that it was a bright day, and that

she was alone at the time of the accident.  She stated in answer to the question which foot she put in the doorway, that "I think I put my left foot up on the doorsill, because my right shoe was badly damaged, and I really cannot remember much after I got in because I remember being pitched, and for the instant I realized I was being thrown and I tried to catch myself and I think I might have helped myself somewhat if I had not struck the stall, but after my head struck the stall I didn't remember anything for the time being because I just went off like that (indicating)." She also testified there was no warning or anything else that would attract one's attention at the entrance of the door to the hole or trench.

The witness Brooks, a produce and fruit dealer in the Richmond Market and who was conversant with the entrances to the market and also saw the plaintiff shortly after she fell, described the condition of the floor of the market as follows:  The floor is all right as far as that is concerned but about one foot inside the curb the contractors opened this trench which the lady fell over.

Q. How large was this trench?  I refer to the particular trench that has been testified to in this case.  A. Possibly five feet long.  Q. And how wide?  A. Between 10 and 12 inches.  Q. And how deep?  A. Three or four inches.  Q. On this Saturday, May 23rd, was this ditch open or was it packed in?  A. Open, three or four inches deep.  Q. Mr. Nichols testified that on April 24th it was packed in tight. Did you see it packed in on May 23rd?  A. No.  Q. Was there any packing in there?  A. To my knowledge there was not.  Q. You mean by that that it was open and this broken concrete had been removed?  A. There wasn't much concrete there.  It was only composed of loose dirt I would call it.  The hole was open and what loose dirt was just pushed back in this trench.  Q. Do you know of your own knowledge how this packing was taken out of the trench or how this loose dirt got out of the trench?  A. Yes, there wasn't any packing done.  Q. Do you know that?  A. There

wasn't no packing to be done. Q. Do you know how it came out? A. I am coming to that and that dirt that was pushed back loosely in this trench— Q. Do you know what caused the packing to come out? A. Yes, it was worn out. Q. Do you know whether or not it came out between April and May 23rd? A. Yes, it was worn out by the constant walking over it. Q. Was it taken out? A. No, sir; just worn out by constant walking over it and stumbling over the holes. It was kicked out. It was a hole between 10 and 12 inches wide and people were treading in this hole and that was making it deeper and wider all the time and they tripping on the edge of the trench made it bigger and deeper and so on and that is how it came out. Q. On May 23rd was there any warning or guard thrown around this particular trench? A. No guard whatever. He also testified, that shortly after the accident the hole or trench was filled upon the order of the market master, that there was a sky-light near the entrance to the door where the accident happened and there was nothing to prevent a person from seeing the trench, that the loose dirt that was worn out had been carried away at various times. That the hole was open sometime and the constant walking over it back and forth made the hole deeper and made the hole wider and broke the edges of the trench and made the hole so much more bigger than what it was.

The only other testimony bearing upon the case, was that of Dr. Lloyd as to the character of the injuries received by the plaintiff, as the result of the accident.

We have thus stated the substantial facts of the case, and upon the evidence disclosed by the record, we are of opinion, the Court below committed an error in granting the prayer set out in the exception, which instructed the jury that there was no evidence legally sufficient to entitle the plaintiff to recover in this case.

There was no prayer presenting the question of contributory negligence, upon the part of the plaintiff, and the only exception, was to the prayer, as to the legal insufficiency of

the evidence, and this is the only question raised by the record. *W. M. R. R. Co.* v. *Carter,* 59 Md. 311; *Magaha* v. *Hagerstown,* 95 Md. 68.

In the case at bar, it cannot be successfully argued that there was no evidence legally sufficient to require the case to be submitted to a jury, under the testimony disclosed by the record.

In *Baltimore Elevator Co.* v. *Neal,* 65 Md. 438, JUDGE ALVEY said, the Court has no power to examine and decide upon the comparative weight of evidence, that is exclusively for the jury. It is the duty of the Court to decide, as a preliminary legal question, whether there be any evidence legally sufficient to be considered by the jury; and the criterion for the determination of that question is whether the evidence is of sufficient probative force to enable an ordinary intelligent mind to draw a rational conclusion therefrom, in support of the proposition sought to be maintained by it. *Jones* v. *Jones,* 45 Md. 154; *Mallette* v. *British Ass. Co.,* 91 Md. 482; *Moyer* v. *Justis,* 112 Md. 222.

If there is any evidence competent, pertinent or of a probative force, to support the plaintiff's case, the weight and value of such evidence should be left for the consideration of the jury, and as it has frequently been stated by this Court, before such a prayer can be granted the Court must assume the truth of all the evidence before the jury tending to sustain the claim or defense, as the case may be and of all inferences of fact fairly deducible from it.

The actionable negligence charged in the declaration, in this case, upon the part of the defendants, consisted in "allowing and permitting an excavation or trench to remain for a long space of time without a covering or warning or signal of any kind, at the doorway of one of its markets in the City of Baltimore and that the injuries of the plaintiff was the direct result, of this negligence.

It was undisputed and conceded, that the trench or excavation in the market was put there by the defendant, the city,

and its contractors, and they knew of its existence at the entrance and across the doorway, at the time of the injury to the plaintiff and that the ownership of the market house was in the Mayor and City Council of Baltimore.

The theory of the plaintiff's case, is that the trench or excavation or obstruction at the entrance or doorway of the market, was a nuisance, existing in one of the highways or public markets of the city, under its control and permitted there by the city and it was this negligent act, that caused the injury.

The duty of a municipality to keep the approach to its public markets, as well as all other parts of its streets, and highways, in a safe condition for public travel, is well established by a number of recent decisions of this Court.

In *Baltimore City* v. *Beck,* 96 Md. 190, we said, if the City negligently fails so to do, and persons acting without negligence are injured, the City is liable in damages for the injuries caused by such neglect. *Balto. City* v. *Walker,* 98 Md. 643; *Magaha* v. *Hagerstown,* 95 Md. 62; *Garrett Co.* v. *Blackburn,* 105 Md. 226; *McCarthy* v. *Clark,* 115 Md. 466; *Annapolis* v. *Stallings,* 125 Md. 345.

As to the contention that there was a total failure of evidence to show how the accident occurred, or what caused it, or that the negligence of the defendants produced the particular injury, we need only say there was some evidence to support the theory of the plaintiff, that she stumbled and fell at the approach of the doorway of the market, by reason of the hole or excavation, that had been made and left uncovered by the city. The weight and value of the testimony was for the jury, to establish the facts sought to be inferred, under proper instructions from the Court.

In *Benedict* v. *Potts,* 88 Md. 54, we said, direct proof of negligence is not necessary but like any other fact, it may be established by the proof of circumstances from which its existence may be inferred.

As the judgment in this case will be reversed and a new trial awarded, we shall refrain from any further comment upon the evidence.

We do not understand that the liability of the defendant, the Nichols Brothers is involved on this appeal. The prayer offered upon the part of the Nichols Brothers, one of the defendants, in the Court below, withdrawing the case from the jury, was conceded by the plaintiff. The prayer was granted as conceded and under the direction of the Court, the jury rendered a verdict on behalf of these defendants. There was no exception to the granting of this prayer. In the brief on behalf of the city, it is stated, that at the conclusion of the plaintiff's case the following prayer (meaning the prayer set out in the exception) was offered on behalf of the defendants, the Mayor and City Council of Baltimore and the Singer-Pentz Company.

It follows, for the reasons stated, that the judgment will be reversed and a new trial awarded, as to the defendants, the Mayor and City Council of Baltimore and the Singer-Pentz Company, a body corporate.

*Judgment reversed and new trial awarded, with costs.*