## SOUTHERN HOTEL COMPANY et al.

### vs.

## ALEXANDER HAMILL.

*Broker's Commissions—Sale of Stock—Procuring Cause.*

In an action for commissions on a sale of corporate stock, *held* that the evidence that plaintiff was the procuring cause of the sale was sufficient to go to the jury. p. 329

It was proper to grant an instruction that in order to entitle an agent employed to sell stock on commission to recover a commission on a sale of stock, the agent, in the absence of proof of usage or of special agreement to the contrary, must prove by a preponderance of the evidence that his efforts to procure said sale were made on the foundation upon which the negotiations for such sale were begun, and also upon which such negotiations were conducted, and upon which said sale was ultimately made; that, in other words, his efforts were the procuring cause of said sale. p. 329

*Decided January 10th, 1923.*

Appeal from the Court of Common Pleas of Baltimore City (DUFFY, J.).

Action by Alexander Hamill against the Southern Hotel Company and A. J. Fink. From a judgment for plaintiff, defendants appeal. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*William L. Marbury,* with whom was *Addison E. Mullikin* on the brief, for the appellants.

*J. Cookman Boyd,* for the appellee.

BRISCOE, J., delivered the opinion of the Court.

This is an action at law, brought by the appellee against the appellants, in the Court of Common Pleas of Baltimore City, to recover commissions for the sale of certain shares of stock of the Southern Hotel Company, to one Winfield S. Cahill, according to an alleged agreement between the plaintiff and the defendants.

The bill of particulars, filed with the plaintiff's declaration, sets out the cause of action as follows: This suit is brought against the Southern Hotel Company and A. J. Fink to recover the sum of $2,500, with interest from the 28th day of July, 1919, being the commissions at the rate of ten per cent. as per agreement between the Southern Hotel Company and A. J. Fink, defendants, on one part, and Alexander Hamill, plaintiff, on the other part, due the said Alexander Hamill by the said Southern Hotel Company and A. J. Fink on account of the purchase of two hundred and fifty shares of preferred stock of the Southern Hotel Company by Winfield S. Cahill for the sum of $25,000, purchased by the said Winfield S. Cahill through the said Alexander Hamill.

The case was tried before a jury, and from a judgment on a verdict, in favor of the plaintiff, for the sum of $500, the defendants have taken this appeal.

The record contains only two exceptions and they both relate to the rulings of the court on the prayers.

The first exception was taken to the refusal of the court to withdraw the case from the consideration of the jury, at the close of the testimony on the part of the plaintiff, upon the ground that no evidence had been offered in the case legally sufficient to show that the defendants or either of them have violated any legal obligation, owing by the defendants to the plaintiff, and therefore, the verdict should be for the defendants upon the pleadings and the issues joined.

As the defendants proceeded to examine witnesses on their behalf after the rejection of this prayer, they lost the benefit of the prayer. They waived the exception, and the ruling of the court on this exception is not before us to be reviewed

on appeal. *Knecht* v. *Mooney,* 118 Md. 583; *Bernstein* v. *Merkel,* 126 Md. 454; *Penna. R. R. Co.* v. *Cecil,* 111 Md. 288; *United Rwys. Co.* v. *Deane,* 93 Md. 624.

After the testimony of both parties had been concluded the plaintiff submitted two prayers, and both of them were refused by the court.

The defendants offered three prayers and, of these, the first and second were refused and the third was granted.

As the action of the court in refusing these prayers present the most important question in the case, they will be first considered by us.

These prayers, it will be seen, sought to withdraw the case from the jury, on the grounds stated in them: first, that no evidence had been offered in the case legally sufficient to show that the defendants or either of them have violated any legal obligation owing by the defendants, or either of them, to the plaintiff and therefore the verdict should be for the defendants upon the pleadings and the issues joined; and second, the jury are instructed that no evidence has been offered in this case legally sufficient to enable the jury to find that the sale of 250 shares of the stock of the Southern Hotel Company to Winfield S. Cahill was procured by the plaintiff, and therefore any verdict should be for the defendant under the pleadings.

As the defendants' first and second prayers are demurrers to the evidence and as they present the controlling question in the case, we will state and examine the evidence disclosed by the record, in so far as it may be necessary for the purposes of the decision of the case.

The evidence shows that A. J. Fink, one of the defendants in the case, was, during the years 1916, 1917 and 1918, treasurer, managing director and fiscal agent of the Southern Hotel Company, a corporation, incorporated under the laws of the State of Maryland. As the fiscal agent he had charge of selling the entire capital stock of the Southern Hotel Company, for the erection of the building, under a commission arrangement, by which the hotel company paid him a com-

mission for the sale of its stock; that the commission varied
from ten to twenty per cent., the average commission on the
stock being about sixteen and one-half per cent., and that,
out of the commissions allowed the fiscal agent, he paid the
agents employed by him their commissions and all of the
expenses incidental to the sale of the stock of the company.

It appears that, on or about the 26th of October, 1916,
the plaintiff was employed by the defendants to sell the stock
of the Southern Hotel Company, and his employment con-
tinued from that date until August 18th, 1918; he was to
receive ten per cent. commission, as compensation on all stock
sold by him for the company.

The plaintiff testified that, sometime in June, 1916, he was
solicited by Mr. A. J. Fink, treasurer of the Southern Hotel
Company, to sell stock for the company, and that on or about
the 26th of October, 1916, he associated himself with the
company for the purpose of selling its stock on a ten per cent.
basis for the stock sold, and that subsequently he sold a large
amount of stock for the company, and for this he was paid a
commission, except for the two hundred and fifty shares of
preferred stock purchased by Winfield S. Cahill for the sum
of $25,000, through his efforts and solicitations.

The witness further testified that, after securing from Mr.
Cahill, in January, 1918, a subscription for $5,000 to the
stock of the company, he continued his efforts to sell to him
a larger amount of stock. "Q. What effort did you make?
A. I called on him repeatedly and wrote him some letters
and tried to make him feel that the thing was worthy of a
larger investment, because I knew Mr. Cahill had the money.
Q. Did you go there with Mr. Fink? A. I took Mr. Fink
down finally. Q. At that time did Mr. Fink know Mr.
Cahill? A. No, sir, not to my knowledge. I took Mr. Fink
down and introduced him and this was after the purchase of
the $5,000 of stock of which I was absolutely responsible in
getting him to subscribe to; I talked stock to him, on this
visit, and I urged him to consider it seriously, because I
thought it was a good thing. Q. Well, then, do you know

whether or not Cahill subsequently purchased additional stock? A. Yes, at one of the stockholders meetings I learned through a member—I wasn't a member—there was some people I had sold and their subscription list showed a larger amount than the amount I had originally turned over, and principal among the individuals was Mr. W. S. Cahill I found subscribed larger. I took the matter up with Mr. Cahill and then I took the matter up with Mr. Fink, and found out that Mr. Cahill had subscribed $25,000 additional stock in the company." That on February 3rd, 1919, he wrote Mr. Fink the following letter and received the following reply:

"My dear Mr. Fink:

"I have not had an opportunity of seeing you since the recent stockholders' meeting of The Southern Hotel Company, at which I ascertained that some of the parties I was instrumental in selling the Southern Hotel Company stock to had evidently increased their holdings.

"As you are familiar with the names of my clients, I will thank you for a report as to any increase that may have occurred, so that I can intelligently make claim for the commissions due me. Your early response is solicited, as it is most important that I have the information and thus avoid the necessity of calling upon them in person.

"Hoping the hotel and your personal affairs are progressing advantageously,

"Alex. Hamill."

"February 7th, 1919.

"Dear Sir:

"I am in receipt of your letter of the 3rd inst., and in reply, advise that I have made settlement with you in full for all commissions to which you are entitled. There are no other subscriptions upon which commissions are due to you.

"A. J. Fink"

The witness then testified that he never received any of commissions due him on the sale of the $25,000 worth of stock sold Cahill, and this amount, with interest, is now due him.

The witness further testified, on cross-examination, that after Mr. Cahill subscribed to the $5,000 of stock in January, 1918, witness went to see him after that for the purpose of getting him to take more stock; that after January, 1918, witness called to see Mr. Cahill about a half dozen times; that these calls were made within a month after the $5,000 subscription; that he had a conversation with Mr. Fink, with reference to making Mr. Cahill a director of the company, and he took Mr. Fink down with him and they talked the directorship and other things over with Mr. Cahill.

Winfield S. Cahill testified in part that he subscribed to the stock of the Southern Hotel Company. Mr. Hamill came to see him several times, and in January, 1918, he subscribed for $5,000, fifty shares of preferred and bonus of twenty-five of common. He was very desirous that he should take more but he refused at that time to subscribe for more. He then testified as follows: "Some time after that—a few days after he came down and then he came probably a few days after that and brought Mr. Fink and he introduced Mr. Fink to me, and they both talked to see whether I wouldn't take $25,000 or more stock. I told them, no, but finally somewhere between January 7th and March 8th of the same year I did subscribe to $25,000 more of the preferred stock of the Southern Hotel Company, on which I received 125 shares of common as bonus of which I paid a quarter of it, $6,250 by check, and the balance, $18,750, was divided into three notes, at three, four and five months. Subsequently, I discounted the three notes and received one hundred and eighty-eight dollars as discount and paid the residue, $18,561.46. Q. When did you first meet Mr. Fink? A. Sometime the early part of January, 1918, after the purchase of the $5,000 of stock. Q. Who introduced him to you? A. Mr. Hamill. Q. Brought him down to your place? A. Yes, sir.

Q. How did you come to be elected a director? A. Why Mr.
Hamill spoke to me in reference to the matter, they thought
if I took a big block of stock I would become entitled to
directorship in the Southern Hotel, and about at the same
time there was somthing said about the Baltimore Trust
Company—I don't know, and if I was director they thought
it would be a good connection if I could get in with both
parties, and Mr. Fink also asked me about becoming director.
Q. Through whose efforts was it that you purchased the
$25,000 of preferred stock? A. Well, Mr. Hamill first
spoke to me about it. Mr. Fink came down afterwards and
I had a talk with him. Q. What was this conversation when
Fink came down afterwards? A. I told Mr. Fink I wouldn't
take it; I would buy it at ninety if I bought at all. He
told me he couldn't afford to do that, it would be par, but
he would arrange to have it so I paid par value, for which I
received Mr. Fink's personal check after I paid my bill in
full of $2,500. Q. Was Mr. Hamill's name mentioned at
that time? A. Yes. Q. Tell the jury the whole thing? A.
Mr. Fink states that he was fiscal agent and that he received
for all stock sold, twenty per cent.; that he paid Mr. Hamill
ten per cent., and if he paid me ten per cent., of course, he
couldn't pay Mr. Hamill the ten per cent. I told him I had
nothing to do with Mr. Hamill, I was buying the stock as
cheap as I could, and then he requested me not to make any
comment to Mr. Hamill with reference to the ten per cent.,
which I didn't until Mr. Hamill wrote to me and asked if I
purchased any stock. Q. Mr. Fink asked you to make no
comment to Mr. Hamill? A. Yes, it was between him and
I, and I didn't make any comment."

The witness testified further, on cross-examination, that
he was not interested in Mr. Hamill, that he considered the
ten per cent. commission, as belonging to him; that he offered
to Mr. Fink to buy the stock at ninety; that he did not think
he was taking Hamill's ten per cent. and wasn't dealing with
Hamill; that according to his honest opinion it belonged to
him; that he received commissions on other sales of stock

from Mr. Fink; that he placed other sales with other persons and received ten per cent. commission on them.

The witness Cahill also testified, in rebuttal, as follows: "Q. Mr. Cahill, you heard the testimony of Mr. Fink on the stand that it was on the evening of the day the hotel was opened, to wit, March 6th, that you agreed to subscribe for 250 shares of stock additional to the $5,000 you subscribed before. Will you tell the gentlemen of the jury whether or not that is true? A. No, sir; that is incorrect. Quite sometime prior to that; I don't think Cahill was feeling good enough to subscribe to anything that night. Q. You were celebrating the opening of the hotel? A. Yes, sir; I wasn't bothering about the stock. There were other things more important. It was sometime prior to that I agreed to take this stock. Q. Where did you agree? A. At my office. I never do business during pleasure hours. Another thing I want to state while I am here. Mr. Fink stated positively he didn't request I say nothing to Mr. Hamill. Mr. Fink knows well—I hardly blame him for smiling—that he particularly mentioned Mr. Hamill—not to tell Hamill."

There was evidence on the part of the defendants, but as it is apparent, from a review of the evidence adduced by the plaintiff, that the question of the proximate or procuring cause of the sale of the stock, here in controversy, was under the facts and circumstances of the case, one for the consideration of the jury, and not for the court, the defendants' evidence need not be set out here.

In *Baltimore Car Wheel Co.* v. *Clark,* 131 Md. 518, it is said, in dealing with a somewhat similar state of facts: "Our duty is limited to a decision as to whether there is found in the record evidence legally sufficient to prove the facts, or stated in another way, our duty is merely to decide whether there is found in the record any legally sufficient evidence from which the jury could properly find those facts. We must assume the truth of the evidence offered by the plaintiff and we must give him the benefit of all legitimate

and fair inferences deducible in his favor from all the facts and circumstances of the case."

It was further held, in that case, that proximate or procuring cause is ordinarily a question for the jury, and the court will not, except in a clear case, decide it. That question was, under the facts and circumstances of this case, one for the consideration of the jury and was submitted to them by appropriate instructions. *Hodges* v. *Baltimore Engine Co.,* 126 Md. 307; *Burke* v. *Baltimore,* 127 Md. 554; *Parker* v. *Power,* 127 Md. 598.

The evidence, in the present case, we think, was sufficient to warrant its submission to the jury and the court committed no error in refusing to grant the defendants' first and second prayers.

The defendants' granted third prayer was a proper instruction and submitted the law applicable to the facts of the case. It is as follows: The court instructs the jury that as a matter of law in order to entitle an agent employed to sell stock on commission, to recover a commission on a sale of said stock, said agent in the absence of proof of usage or of special agreement to the contrary, must prove by a preponderance of the evidence, that his efforts to procure said sale were made on the foundation upon which the negotiations for such sale was begun, but also upon which such negotiations were conducted and upon which said sale was ultimately made; that, in other words, his efforts were the procuring cause of said sale.

Finding no error in the rulings of the court, the judgment will be affirmed.

*Judgment affirmed, with costs.*