ALFRED C. CHENEY and others *vs.* THE EASTERN
TRANSPORTATION LINE.

*What constitutes a Sale—Contract by Letters—Acceptance—*
*Right to maintain action of Replevin—Absence of Tenancy*
*in common—Defective instruction covered by Act of* 1862,
*ch.* 154.

To effect a sale it is only necessary that the parties fully agree, in the
respect to a thing capable of identification, that for a stipulated
price the title to the thing shall pass from vendor to vendee. If it
be sold for cash, or on credit with agreement that possession shall
not be given till the price is paid, the vendor has a lien for his price,
and nothing but tender, or actual payment can give the right of
possession. The effect of a complete contract of sale is to vest the
property in the bargainee.

The Steamer Falcon was lying in Baltimore, and R. of New York,
acting for the Eastern Transportation Line went to Baltimore,
where on the 14th of December, 1880, he met P. the agent of the
owners; they examined the vessel which was a wreck. R. told P.
that if he purchased the vessel, he would cut off all above the
upper deck, with the exception of a small portion he mentioned.
P. asked R. to make an offer for the hull which he declined to do,
until P. had named his price—this P. did and R. declined, and
offered $400; P. thereupon proposed that they should see the
owners, whither they went. There R. offered them $400 for the
hull delivered in Baltimore, or $500 delivered in New York; and
said that he was in no hurry and would give them until the 15th
of February, 1881, to deliver it; that he would pay the cash; and
being about to go home, he said if he found a letter on his desk
next morning, accepting his offer of $400—he would leave the offer
open up to that time—he would take it. On their way to the
train, P. accompanying R. thither, P. asked R. if he cut the vessel
down, would he let him have the wood off her? R. said, cer-
tainly, he did not want it. P. then asked R. if he docked the hull,
could he P. take out the shaft and wheel? R. replied, yes, that he
would have the vessel on the dock, probably, 48 hours, and if P.
had it taken out in that time, there should be no charge. On the
next day R. received a letter from P. dated Baltimore, the 14th

Cheney, *et al. vs.* Eastern Transportation Line.

of December, 1880, saying "I have concluded to accept your offer on the hull of the Falcon at $500, N. Y. or $400, here, to be delivered until the 15th of February, 1881, the latest; that all the off fall from said hull above the barch line to go to Charles Winternitz & Sons, and that if delivered here while forty-eight hours on the dock, you will allow me to take such machinery out of her hull that I cannot while in her present place. If you agree to these terms, please reply, the money to be paid as soon as the transfer is effected." On the 15th of December R. replied: "your esteemed favor is at hand accepting my offer for the hull of the Steamer Falcon. I understand the 'barch line' mentioned in your letter to be that of the main deck, and that the masts go with the hull. I will request Bolander to draw up the usual contract, &c. The terms I understand to be cash on delivery either in New York or Baltimore." In reply to this, P. on the 16th of December, 1880, wrote saying "I understand from you that all broken parts should be cut off; that is what I ask for fire wood for some of our laborers; and if any small amount of *all* (old) iron, you will certainly not take it with you to New York, there is but little of it. The masts belong to the barch of course." To this R. replied on the 16th of December, 1880, "We are perfectly willing you should cut off and retain the wood and iron on hull of Falcon, above the main deck, only stipulating if you take any, that you take all off, if in doing this, the hold of the masts to the hull, is too much wrecked to be safe, I will receive them laid on the deck." On the 18th of December, 1880, P. replied, inquiring "do you mean for me to have that work done for you? if so, limit me to a price, and to whom you would like me to give the job? tell me exact how much to cut off, and how high to leave at the stem, all the off fall I will take, such above the barch line." R. on the 21st of December, 1880, replied, "You seem to be under some misapprehension in regard to the Falcon's hull. I consider that I have bought the hull, including the masts, delivered at your option, either in Baltimore, or New York; but not the engine, boiler, anchors, and chains, &c. I do not desire that you should do anything to the hull at all, but as I do not propose to use that part of the hull, above the lower deck, I am willing, if you desire to do so at your own expense, that you should cut off that part of the vessel, retaining the material for your own use. I want the stem and apron, and about fifteen feet in length of the bow above the lower deck, with the upper deck attached, left on the hull. You speak in your letter of the barch line, this I do not understand. The alterations and removals to the hull, I will attend to myself after the hull is delivered. Sub-

Cheney, *et al. vs.* Eastern Transportation Line.

sequent to this correspondence and without notice to R., Winternitz & Sons sold the wreck Falcon to C. on the 11th of February, 1880. C. having informed R. that he had purchased, R. through Bolander on the 15th of February tendered $400, the price for Baltimore delivery, which was refused. In an action of replevin by the Eastern Transportation Line to recover the hull and masts, it was HELD:

1st. That the correspondence established a valid contract between the parties for the sale of the hull of the Steamer Falcon, and the plaintiff was entitled to maintain his action of replevin for the recovery of the same.

2nd. That there was no tenancy in common in the vessel as between the plaintiff and the defendants;—the will of the owners had separated machinery and hull, and had given each a separate and independent existence.

Where the Court below in its instruction fails to submit to the jury to find a fact important as an element in the right of the plainiff to maintain his action, and no objection is taken at the trial, the Appellate Court will not reverse for such defect, the same being covered by the Act of 1862, ch. 154.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

*First* and *Second Exceptions* omitted as they were not passed upon by the Court.

*Third Exception.*—The evidence on both sides being closed, the plaintiff offered the following prayer:

If the jury find from the evidence that the defendant, Perretz, was authorized by the owners to sell the Falcon, and if they find the letters offered in evidence in the cause, then the same letters constitute a contract in writing, for the sale of the hull of the steamer Falcon to the plaintiff, whereby the property passed, and the plaintiff is entitled to recover, unless the jury find that such contract was subsequently rescinded by the joint agreement of the plaintiff and the owners of the vessel.

The defendants prayed the Court to instruct the jury as follows :

1. The plaintiff has not proven such title to the property replevied, as to entitle it to a verdict, and the verdict must therefore be for the defendants.

2. If the jury believe from the evidence that Perretz did not accept the proposition of Robert for the purchase of the hull of the Falcon, except on conditions, and that said conditions were not agreed to and accepted by Robert, then the plaintiff is not entitled to recover.

3. If the jury believe from the evidence, that in the early part of January, 1881, the witness, Frederick Robert, acting for plaintiff, in conversation with the defendant, Cheney, advised the defendant, Alfred C. Cheney, to come on from New York to Baltimore, and buy the entire wreck of the steamer Falcon, including hull as well as the machinery, and said that if he should do so, the plaintiff would buy the hull from him, and would pay him therefor $500, delivered in New York, and that he, Robert, did not then intimate to the witness, Cheney, that the plaintiff either had, or claimed to have bought the said hull, and shall further believe that Cheney, in consequence of that advice, came on to Baltimore and made with the defendants, Winternitz & Sons, the contract given in evidence, dated February 11th, 1881, the plaintiff is not entitled to recover in this action.

4. That though the jury may believe from the evidence, that the plaintiff bought the hull of the steamer in dispute, in the month of December, 1880, yet if they also believe from the evidence, that the defendant, Cheney, bought the entire steamer in the month of February, 1881, as shown by the contract of February 11th, 1881, offered in evidence, in ignorance of the fact, that the plaintiff had previously bought the hull, their verdict must be for the defendants.

The Court (GILMOR, J.,) granted the plaintiff's prayer, and refused those of the defendants.   The defendants ex

cepted, and took this appeal, the verdict and judgment being for the plaintiff.

The cause was argued before MILLER, ALVEY, ROBINSON, IRVING, and RITCHIE, J.

*John H. Thomas,* for the appellants.

*Julian I. Alexander,* for the appellee.

IRVING, J., delivered the opinion of the Court.

This is an action of replevin brought by the appellee against the appellants to recover the hull and masts of the steamship Falcon. The undisputed facts are as follows: The vessel was lying at Baltimore, and Frederick Robert, President of the Eastern Transportation Line, went to Baltimore to examine the boat; there he met Perretz, the agent of the owners, Messrs. Winternitz & Sons, with whom he went to examine the hull, which was a wreck. Perretz named a price which Robert declined; and, on being asked to make an offer, Robert offered $400.00. Perretz then took him to the owners, and he there said to the owners: "Gentlemen, I will give you $400.00 for that hull delivered in Baltimore, or $500.00, delivered in New York; I am in no particular hurry for the hull and will give you until the 15th of February to deliver it." They then talked of the machinery and telephoned somebody to know what it would cost to take it out and store it, when, as it was nearing train time, Robert said he was going, "and if he found a letter on his desk next morning accepting his offer of $400—he would leave the offer open till that time—he would take it." During the examination of the hull, Robert told Perretz, if he purchased the hull, he should cut off all above the upper deck. On their way to the train, (to which Perretz accompanied Robert), Perretz asked Robert if he cut the vessel down "will you let me

36          v. 59.

have the wood off her ;" and Robert said, " yes, certainly. I don't want it." Perretz then asked Robert if he docked the hull could he, Perretz, take out the shaft and wheel, Robert replied, that he would have the vessel on the dock probably 48 hours, and if Perretz had it taken out in that time there should be no charge. This was on the 14th of December, 1880 ; and on the next day Robert received the following letter, dated Baltimore, Dec. 14th, 1880. " Frederick Robert, Esq., President Eastern Transportation Line, Jersey city, Dear Sir :—I have concluded of accepting your offer on the hull of Falcon, at $500, New York, or $400 here, to be delivered, until the 15th of February, the latest; that all the ̇off fall from said hull, above the barch line to go to Charles Winternitz & Sons, and that if delivered here, while forty-eight hours on the dock, you will allow me to take such machinery out of her hull, that I can't while lying in her present place. If you agree to these terms, please reply, the money to be paid as soon as the transfer is effected. To your worthy name, hoping these lines will find you in best of health, I am very respectfully, yours,                T. B. PERRETZ.

P. S.—Should you learn of any one that would purchase boiler and engine, refer them to me.    Answer me, please, at your earliest convenience." ·

To this letter Robert replied as follows: " New York, Dec. 15th, 1880.   My Dear Sir :—Your esteemed favor of the 14th inst. is at hand accepting my offer for the hull of the steamer Falcon.    I understand the barch line mentioned in your letter to be that of the main deck, and that the masts go with the hull.    I will request Mr. Bolander to draw up the usual contract for us, it is part of his business, and he can make no extra charge for the same.    The terms I understand to be cash on delivery, either in New York, or Baltimore.    With regards to Messrs. Winternitz & Sons, I am yours, truly."        FRED. ROBERT, Pres't.

Mr. T. B. Perretz, Baltimore, Md.

In reply to this was another letter from Perretz as follows: " Baltimore, Dec. 16, 1880.  Frederick Robert, Esq., President Eastern Transportation Line, New York. Dear Sir:—Yours of the 15th inst. to hand, contents carefully noted, hoping that I have not asked anything that is of any value to your company.  I understand from you that all the broken part should be cut off; that is what I ask for fire wood for some of our laborers; and if any small amount of all (*old*) iron you will certainly not take it with you to New York, there is but little of it.  I have mentioned these facts to Mr. Bolander.  The masts belong to the barch, of course.  With best regards from my folks, as well as from me, I am yours, very respec'y."

T. B. PERRETZ.

To this Mr. Robert replies, " New York, Dec. 16, 1880. Dear Sir:—Yours of the 15th is at hand and contents noted.  We are perfectly willing you should cut off and retain the wood and iron on hull of Falcon, above the main deck, only stipulating if you take any that you take all off. If in doing this the hold of the masts to the hull is too much wrecked to be safe, I will receive them laid on the deck.  Yours, truly."            FREDERICK ROBERT, Pres't.

P. S.—I think you had perhaps better leave the stem and —— standing for about four feet above the deck.  F. R.

On the 18th of Dec., 1880, Perretz writes, "Dear Sir:— Yours of the 16th inst. to hand, contents I can hardly understand; do you mean for me to have that work done for you? if so limit me to a price, and to whom you would like me to give the job? tell me exact how much to cut off, and how high to leave at the stem, all the off fall I will take, such above the barch line.  Awaiting an early reply with instruction, I remain, very respectfully, yours,

T. B. PERRETZ."

On the 20th Mr. Coffin, Mr. Robert's secretary, writes that his letter had been received, and Mr. Robert would write the next day "about the work, and in the meantime you are to do nothing."

On the 21st Dec., 1880, Mr. Robert writes, "My Dear Sir:—Yours of the 18th instant is at hand, and you seem to be under some misapprehension in regard to the Falcon's hull. I consider that I have bought the hull including the masts delivered at your option, either in Baltimore or New York; but not the engines, boiler, anchors and chains, &c. I do not desire that you should do anything to the hull at all, but as I do not propose to use that part of the hull, above the lower deck, I am willing, if you desire to do so at your own expense, that you should cut off that part of the vessel, retaining the material for your own use. I want the stem and apron, and about fifteen feet in length of the bow above the lower deck, with the upper deck attached, left on the hull. You speak in your letter of the "barch line," this I do not understand. The alterations and removals to the hull, I will attend to myself after the hull is delivered. If you have any trouble in understanding this letter, read it to some master shipwright, and he will be able to explain it I think, so there will be no trouble."

The next letter Perretz writes, he only says, "would you object for me of having any caulking done on the lower part of the hull, if I should find it necessary in order to bring her safe to New York. She might be dry on the side, if so limit me, to what extent, by return mail and by so doing oblige, respectfully yours."      T. B. PERRETZ.

Mr. Robert replied through his secretary, on the 30th Dec., that "he does not feel authorized to allow any repairs or caulking done to the hull."

Subsequent to this correspondence, and without notice to Mr. Robert, Winternitz & Sons sold the wreck Falcon, to the appellant, Cheney, on the 11th of Feb., 1880. Cheney having informed Robert that he had purchased, Robert (through Bolander, the agent who had brought him and Winternitz & Sons into treaty), on Feb. 15th, tendered the $400, the price for the Baltimore delivery—which being refused, this replevin was sued out.

Upon these facts, the appellants contend, that there was no contract to support the action of replevin, while the appellee insists that the correspondence establishes a perfect contract between the parties, through which the appellee was entitled to the boat, and fully justified the action brought. There was other evidence offered on the part of the plaintiff to support this view of the case, to which we think it unnecessary now to advert, as in our view the correspondence establishes a contract of sale, without that additional evidence, which, however, was most valuable to the jury.

This is a possessory action, and it is necessary that there should be a concurrence of all the elements of a contract, not only for the passage of title, but to give the right to immediate possession to the vendee. To effect a sale it is only necessary that the parties fully agree, with respect to a thing capable of identification, that for an agreed price the title to the thing shall pass from vendor to vendee. If it be sold for cash, or on credit, with agreement that possession shall not be given till price paid, the vendor has a lien for his price, and nothing but tender or actual payment can give the right to possession. 1 *Parsons on Contracts,* 519, 524, 525–6. The effect of a complete *contract of sale* is, as very clearly stated by Baron PARKE in *Dixon vs. Yates,* 5 *Barn. & Ad.,* 540, cited by appellee, "to vest the property in the bargainee; but there is an element here, not involved in that case, namely, that the price was to be paid as a condition for delivery of possession, and the right of possession accordingly, depended on payment or tender. It is a very common thing to buy and sell by letter. In such cases the correspondence contains the contract, and it is for the Court to construe the contract as it is extracted from the correspondence. *Eliason vs. Henshaw,* 4 *Wheaton,* 225 ; *Carr vs. Duvall,* 14 *Peters,* 77 ; *Bonnewell vs. Jenkins, L. R.,* 8 *Ch. Div.* 70 ; *Prop'rs, Eng. and For. Credit Co. vs. Arduin, L. R.,* 5 *E. and I. App.,* 64 ;

*Turner vs. Yates*, 16 *How.*, 23; *Watts vs. Ainsworth*, 1 *H. & C.*, 83. The last cited case is very analogous to this.

Perretz's first letter, dated 14th Dec., 1880, distinctly accepts Robert's offer, made orally to Winternitz & Sons, in the presence of Perretz, with the additional conditions suggested by him to Robert in their conversation on the subject. Comparing that letter with the proof respecting the oral interviews, we find it substantially embodies the conditions upon which the sale was to be made. Robert's reply on the next day acknowleged Perretz's letter as an acceptance of his offer as made. He suggests no deviation as having been made by Perretz, nor makes any qualifications himself. He simply says he has received his letter accepting his offer, proceeds to say what he understands Perretz to mean by "barch line," and that he understood the masts to go with the hull—showing his confidence, that they had reached a definite understanding, he says he will direct Mr. Bolander to prepare the formal contract. In Perretz's next letter he makes no objections to Robert's interpretation of his meaning in the use of the term "barch line," and expressly says "of course the masts go with the hull." The reference by Robert to the preparation of a formal contract, cannot negative the idea that the parties had already bindingly agreed on the matter, and so fully understood. In *Bonnewell vs. Jenkins* (already cited) the Judge says that a long series of cases has established, that reference to a future contract, is not enough to negative a present one. Reference is there made to *Crowly vs. Maycock*, *L. R.*, 18 *Eq.*, 180. We think those letters establish a contract between the parties from which neither had the right to recede, without liability for breach of it. The distinct recognition, in Perretz's second letter of Robert's expressed understanding of what Perretz meant by what he said in his letter of acceptance, made that letter, as explained by Robert, the contract of the parties. In Perretz's second letter he proceeds to explain

why he asked for the "off fall," and asks for "the old iron." Had this additional request been refused, it would not have affected the contract, for Perretz had no right to add other conditions to the offer he had accepted. But Perretz's language is that of *request* and shows he understood the company had bought. On the 16th December, Robert grants the request about the wood and iron, giving directions respecting the same. On the 18th, Perretz inquires if he wants him to have the work done for him, evidently treating the sale as fully effected. Robert replied that he would attend to the work himself, but adds that as he "does not propose to use that part of the hull above the lower deck, he might take that off at his own expense." At this no dissatisfaction is expressed. It is simply followed by an inquiry if he is willing that caulking may be done in order to get her safely to New York; thus again showing he regarded the boat as belonging by contract, to Robert's principals. Robert replied to that inquiry, saying, he did not feel authorized to allow any repairs, and the correspondence was suspended. We think the first two letters made a contract between the parties, which the third clearly recognized, and we find nothing, after Robert's letter acknowledging the letter, accepting his offer and recapitulating the terms in the correspondence legitimately open to controversy, unsettled. We therefore agree with the lower Court in regarding the letters as making an effectual contract of sale. There was, however, in the instruction which was granted upon the part of the plaintiff, an important omission. It entirely ignores the necessity for the jury to find the price paid or tendered by plaintiff, and puts the right to recover in replevin purely on the contract, found in the letters. It was clearly proved that on the last day limited for the delivery, four hundred dollars, the price, if delivered in Baltimore, were tendered Winternitz & Sons. Being uncontradicted, it seems to have been treated as a *concessum* in the case, and its importance, as

an element to maintain replevin, seems to have been lost sight of; for the omission to leave that to the jury to be found, does not seem to have been made an objection in the lower Court, and it was not pressed here. Being defective we feel bound to notice it, but we think it is covered by the Act of 1862, ch. 154, as expounded in *Morrison & Kildow vs. Hammond's Lessee*, 27 *Md.*, 604; so that we cannot reverse for that infirmity in the prayer. By the terms of the contract, Winternitz & Sons were entitled to the option of delivering in New York, for $500, or in Baltimore for $400. They not only failed to make their election in favor of New York delivery, but delayed till the last day limited for delivery, and then repudiated the contract by letter which is in the record. By their conduct they made performance in New York, in accordance with the contract, impossible, and rendered tender of Baltimore price sufficient. *Benjamin on Sales, sec.* 567.

We cannot regard the objection pressed by the appellants' counsel, to the granting of the plaintiff's prayer and the refusal of the appellants' first prayer, as sound. He insists there is no evidence that the plaintiff bought. We think there is. Perretz's letter accepting Robert's verbal offer, addresses Robert as "President of the Eastern Transportation Line, New York," and being the first letter after the personal interview, it would seem as if Robert had told him whom he represented. Throughout the correspondence, Perretz so addresses Robert; and Robert in his second letter, dates it from the office of the company. In Perretz's second letter, in the body of it, he recognizes the company as the purchaser by saying he hoped he had not asked "any thing of value to your company." We can not say, therefore, there is no evidence that Robert was buying for the plaintiff with the knowledge of the vendors.

Appellants' counsel further contended that replevin did not lie because there was a tenancy in common, in respect to the hull and the machinery; and that the only remedy

was by suit for a breach of the contract, if there was one. He insisted that replevin necessarily worked injury to the owner of the machinery and devolved a duty on the officer executing the writ, which he was not bound to perform, of taking out the machinery, before delivering the hull to the plaintiff. This position was ably and strenuously urged and was most ingeniously illustrated; but we cannot hold that there was a tenancy in common and that by reason of the situation, the replevin was not available as a mode of redress. The authorities cited in support of appellants' contention contemplate cases of actual tenancy in common in *the* thing sought to be replevied. In the case of *Ferral vs. Kent,* 4 *Gill,* 209, the thing in controversy was an undivided interest in a crop of tobacco. There had been no ascertainment of the respective shares and several possession accordingly, and in such case there was no room to doubt replevin did not lie. In *McElderry vs. Flanagan,* 1 *H. & G.,* 308, the interest, about which the learned Judge declared that replevin would not lie, was an interest in a vessel, which was not capable of enjoyment in severalty. The thing was a whole and could only be possessed as such, being incapable of manual division without destruction. So it will be found of all the cases where replevin has been held not to lie, that the thing itself could not be divided, or had not been finally divided, so that the separate parts were capable of designation and certain delivery under the writ. The tenancy in common still actually existed in the thing.

In this case the vessel was a wreck, and was no longer to be used as a steamship. So long, of course, as the boat was plying as a steamship, the hull and machinery would have been inseparable, except at the will of the owner. A *fieri facias* for illustration could not have taken the machinery from the hull, because it would have involved the destruction of the steamship. But here, the boat being no longer useful as a steamship, the will of the owner

had separated machinery and hull, and had given to each a separate and independent existence. Neither was longer of use to the other, and only by separation could either be utilized. The machinery was not a part of the hull, but was different in kind and use, subject to perfect identification, and *vice versa.* The hull was only the receptacle of the machinery; and the machinery was only essential to the hull so long as it was needed to propel it. Having fully served its purpose in that regard, the owner had abandoned the conjoint use of the two things, and by his will had separated them for independent uses. He had sold the hull, reserving the right to remove the machinery therefrom. The purchaser of the hull had bought it, subject to any incidental injury from wrenching necessary for the removal of the machinery. After that sale, the owner of the hull had no possible interest in the machinery, and the owner of the machinery had not the slightest interest, *in common*, with the owner of the hull. There was, therefore, no tenancy in common. From the moment there was a perfect sale of the hull apart from the machinery, there can be no doubt the machinery was separately seizable under attachment or *fieri facias* by the creditors of Winternitz & Sons, or would have been repleviable by a purchaser of it. Under a writ of replevin for the hull, the officer may not have been required to remove the machinery before delivery to the plaintiff; but in such case the machinery would not be hurt, nor would the owner's title be defeated, or his right of possession disturbed. In fact, he was notified to come and get his property. No greater reason exists for denying replevin in this case, than would exist if it were sued out to recover possession of a wagon, happening at the time to be full of articles belonging to other persons. If additional trouble resulted to the owner of the machinery in respect to getting it away, it would not be the fault of the purchaser of the hull, but would be chargeable to the

owners' delay in getting it out of the hull; just as the owners of the articles in the wagon of the case suggested for illustration, would have to suffer the misfortune of another removal for having trusted their goods in the wagon upon the faith that it was really the expressman's property.

Under the view we take of the correspondence and its effect, the second prayer of the defendants has no basis of fact upon which to rest.

The rejection of the third and fourth prayers of the defendants is fully justified in the want of legally sufficient proof to sustain the theory upon which they proceed. If the defendant Cheney was induced by the plaintiff's agent, Robert, to buy the hull and machinery of the Falcon by suggestions respecting the same, and that he should do so, and without information that the plaintiff had bought the hull, and there was any proof to show that the plaintiff had authorized Robert to waive any rights they had secured by their contract of purchase, of course, the plaintiff would be estopped as against the defendant Cheney. But as we read the proof, there was a failure to lay a sufficient foundation for the putting of such question to the jury. The only testimony bearing upon this question is the respective statements of Robert and Cheney. Robert says, that on the 11th of January he first saw Cheney and had a conversation, in which Cheney asked about the machinery of the Falcon, which witness suggested would be useful to him. Cheney then inquired about the hull, and told Robert that Perretz said he had not sold the hull to the plaintiff, to which Robert replied that was a mistake, "that he had a written contract for the hull and was going to have it." Cheney then inquired if he bought the engines how he could get them to New York. Robert then said, "you had best go to Baltimore; if you buy the engines, *I will see if I can make* an arrangement so you can take title to the whole thing, and bring it to New

York, as you have tugs, and you can make money towing it up, *provided* you agree to deliver me that hull in New York for the $500 I am to pay Winternitz; and as the weather is severe, I 'will extend the time for delivery of the hull until the 15th of March." Robert says Cheney was to let him know, but did not. He saw him again on the 12th of February, when Cheney told him he had bought the whole thing and did not intend to let him have the hull for the $500, because he could get more money for it. Upon Robert's remonstrating if he thought it right after he had told him he had bought the hull, to interfere with his trade, Robert says Cheney replied that he had letters from Perretz saying he had not sold the hull to Robert.

On examination-in-chief, Cheney said he had an interview with Robert between the 10th and 15th of January, in which Robert said he would "like to have the hull; if you can use the machinery perhaps we can make a trade; you had better go down and see it, and if you can make a trade with these gentlemen for the whole ship, just as she is, and bring her to New York, I will take the hull and make a barge of it. Witness asked what he would allow him for the hull, and he said $500. Witness did not *understand Robert* to profess to have bought the hull; witness would not have come to Baltimore if he had." Witness said he made his contract in consequence of Robert's suggestion, but there was no agreement that he would let him have the hull for $500. On cross-examination, witness was asked, "Did you not say to Mr. Robert in your first conversation, that you wanted to know what he had done with the Falcon in Baltimore?" and answered "I do not recollect." On being pressed if he would swear he did not so ask, said, "he would not swear it." Witness further said "he would not swear he did not ask Mr. Robert in the first interview what he had done with the Falcon in Baltimore," and further said

"he would not swear that Robert did not tell him at that first interview he (Robert) had it in black and white that Perretz had sold the hull to him (Robert)." We must regard the statement-in-chief, as so far qualified by the statement on cross-examination, as to reduce his statement-in-chief, that Robert did not give him *to understand* that he had bought the hull, into one of uncertainty whether he told him so or not. We have, therefore, the unequivocal statement of Robert that he did tell him he had bought the hull, "and was going to have it," offset by a statement that he would not swear Robert did not so tell him. Unhesitating affirmative statement on the one side, and on the other uncertain recollection and refusal to swear Robert did not so inform him. Upon such proof, and *no more*, we cannot think the jury would be warranted in finding the facts necessary to support the prayer's hypothesis, and hence, for the want of legally sufficient evidence to sustain it, the prayer was properly rejected.

The fourth prayer was intended to declare, that as against the defendants, under our statute, the sale to the plaintiff carried no title, for want of bill of sale, acknowledgment and record; unless the defendants purchased with knowledge of plaintiff's prior purchase. The proof did not warrant this instruction, and it was properly refused. Robert states expressly, that he told Cheney he had bought the hull, and afterwards upbraided *him* for buying, when he had told him he had bought. This is not positively contradicted by Cheney, as before stated, and the rule applied to the third prayer, must also be applied here. Taking this view, the questions of evidence presented in the other bills of exception become unimportant. The judgment will be affirmed.

*Judgment affirmed.*

(Decided 8th March, 1883.)