COCHRANE V. JUSTICE MINING CO. ET AL.

1. CONTRACT FOR MINING LEASE — ESSENTIAL ELEMENTS.— Where a mining company, desiring to lease its mines, advertised that bids would be received therefor to a certain date, and a bid was received within the time designated, stating the terms on which the applicant would take and work the property, which bid and terms were formally accepted by the officers of the company, it was *held* that the advertisement, the bid and the acceptance contained all the essential elements necessary to constitute a concluded and valid agreement for a lease.

2. SPECIFIC PERFORMANCE — ENFORCEMENT OF CONTRACT FOR LEASE.— Wherever it is shown that there is a definite and concluded legal contract existing between parties, it may be enforced by a suit for a specific performance. And the fact that at the same meeting of the mining company which accepted the plaintiff's bid a motion was passed, but not communicated to him, by which the president was empowered to draw up a lease, in conjunction with the plaintiff or his agent, and present it to the board of directors for their consideration, in no way affected the conclusiveness or validity of the agreement, it being wholly an *ex parte* act of the mining company, and in no sense a part of the stipulations of the agreement. The clause of the bid "settlement as usual" appearing from the action of the company to have been understood by its officers, it is immaterial whether it referred to the mode of computation and times of payment previously existing between the parties or to the established custom of the mining district, either being sufficiently definite to constitute a part of the contract.

3. INABILITY OF LESSOR TO PERFORM CONTRACT NO DEFENSE.— It is no defense to an action for specific performance that defendant had previously leased a part of the property mentioned in the agreement

to another party and could not make a lease of the whole, especially where the plaintiff was willing to take the residue with the rents of the portion already leased.

4. LESSEE NOT BOUND TO ACCEPT LEASE CONTAINING ARBITRARY CONDITIONS NOT MENTIONED IN STIPULATIONS.— Under the contract for a lease plaintiff was not bound to accept a lease requiring him to sink a shaft six hundred feet deep in a certain portion of the property. regardless of its productiveness, and reserving to the company the privilege, under certain contingencies, of disposing of the ore as mined.

*Error to District Court of Lake County.*

Mr. T. J. O'DONNELL and Mr. L. S. DIXON, for plaintiff in error.

Messrs. RUCKER & TITCOMB, for defendants in error.

REED, C. This was a suit in equity, brought by plaintiff in error against the defendants, to compel the specific performance of an alleged contract to lease certain mining property in the county of Pitkin. Upon the hearing a decree was entered dismissing the suit.. The pleadings were very lengthy, and a large mass of testimony was taken. The issue made by the pleadings, and the facts established by the testimony, deemed necessary for an understanding of the case, are, to save repetition, embraced in the opinion instead of in a statement of the case. There are numerous assignments of error, many upon minor and unimportant points. The only one necessary to be considered is the general one — the twelfth: "That the court erred in its finding, judgment and decree in favor of the defendant and against the plaintiff."

There being no serious controversy in regard to the facts and premises, the determination of the case depends upon the solution of the following questions or propositions:

*First.* Did what transpired between the parties constitute a binding and concluded agreement for the lease of the property; and if so, was it sufficiently definite to be enforced in a proceeding to compel specific performance?

*Second.* Was the failure to consummate the agreement by a written contract of lease attributable to the plaintiff or defendants?

The advertisement for bids to lease the property of defendants was as follows: " Bids will be received at the office of the Justice Mining Co., up to noon on March 18, 1889, for lease or leases on the properties of the Justice Mining Co., consisting of the Justice, Marlin, Monte Cristo, and Western Union, situated in Tourtelotte park, and consisting of 26.8 acres. Bids to be addressed to Peter Lux, President J. M. Co." In response to this, plaintiff, who had formerly, with others, a lease upon and worked the same property, as alleged, at great pecuniary loss, made three proposals or bids,— two for a portion of the property, which we need not consider, and the third for the entire property, as follows: " I will take lease on the whole property at thirty-five per cent. royalty at eighteen months, and agree to expend, under the best management obtainable, at least five thousand (5,000) dollars each and every month during life of lease in development work, I to have thirty (30) days to begin work, in order to make examination of property, and put machinery in place. Lease to date from time of commencing work. Settlement as usual."

At a corporate meeting of the officers of the defendant the third proposition or bid of plaintiff was accepted, and evidenced by the following entry made in the minutes of the corporate proceedings: " After some deliberation it was moved and carried that F. T. Cochrane & Co.'s proposition for lease on the three sections of the Justice Mining Co.'s property, according to paragraph 3, be accepted. (Date of proposition, Denver, Colorado, March 16, 1889.) Moved and carried that all other bids be rejected." And as appears in the minutes of the same meeting, the following corporate action was taken: " Moved and carried that the president be empowered to draw up the lease in conjunction with Mr. Cochrane or his agent, and present it to the board of directors for their consideration. Moved and

carried we now adjourn subject to the call of the president."

On the same day the defendant, by Peter Lux, its president, sent the following telegram to plaintiff, at Denver: " F. T. Cochrane, Senate Chamber: Lease awarded to you on last proposition.　Peter Lux."

The advertisement or offer to lease was definite in regard to the property to be leased, naming the respective claims constituting the property, and giving the aggregate area in acres and fractions of an acre.　The bid of plaintiff was, as to extent of property, length of term, percentage or rental to be paid, and amount to be expended monthly in development, and manner of expenditure, equally definite. The corporate acceptance by defendants entered of record was a general and unqualified acceptance of the plaintiff's bid as made, and the notification of the acceptance general and unqualified.　Under the authorities, to create a valid contract of lease but few points of mutual agreement are necessary : *First*, there must be a definite agreement as to the extent and bounds of the property leased ; *second*, a definite and agreed term ; and *third*, a definite and agreed price of rental, and the time and manner of payment.　These appear to be the only essentials ; the others, such as the covenant for the peaceful possession on the part of the lessor, diligent, proper, workmanlike and continuous working with a view to best results, both present and prospective, on the part of the lessee; and where, as in this case, the rental is a share or percentage of the proceeds, the disposition of the ore to the best advantage, the keeping of accurate and honest accounts and making honest returns, are secondary and implied covenants, growing out of the principal agreement.

It is contended by counsel for defendants that the above-recited acts of the parties did not constitute a concluded agreement; that they in certain respects lacked the necessary definiteness, and could only be regarded as inconclusive negotiations in regard to a specific contract to be

afterwards agreed upon and executed by the parties.   It is contended, first, that there was no definite time designated for the beginning of the term.   With this we cannot agree. The language of the bid is: "I to have thirty days to begin work. * * * Lease to date from time of commencing work."   If the offer was accepted, and plaintiff notified of its acceptance, the agreement for lease would be concluded as of that date, and the thirty days would commence to run, and the term would commence at the expiration of the thirty days.   It is also contended that there was a want of definiteness in regard to the basis upon which the rental of thirty-five per cent. was to be computed, as to what expenses of production the gross proceeds from ore were to be subject before calculating the percentage, and the offer of plaintiff, containing in regard to payment only the words "settlement as usual."   It is contended that there could be no concluded contract until the terms of payment were definitely settled, specified and defined.   The plaintiff had for a long time been a lessee of the same property.   The clause "settlement as usual" evidently relates to one of two well-understood premises, either — *First*, to the former method of computation and time and manner of payments existing between the parties; or *second*, a well-known and established custom of the district; either one of which was sufficiently definite to constitute a part of the contract.   It is immaterial to which it referred.   It is evident from the action of the board of officers that it was properly under- stood at the time of the acceptance.   No objection was made to it on account of uncertainty or indefiniteness. Nothing more definite was required or asked.   The accept- ance was complete and unqualified.   Had the indefiniteness now relied upon in argument suggested itself to the officers at that time, it would necessarily have resulted in the rejec- tion of the bid, or in requiring a better defined offer.

In *Van Ness v. Pacard*, 2 Pet. 148, it is said: "Every de- mise between landlord and tenant in respect to matters in which the parties are silent may be fairly open to explana-

tion by the general usage and custom of the country or of the district where the land lies. Every person under such circumstances is supposed to be connusant of the custom, and to contract with a tacit reference to it." This is the universal doctrine, and further authority is considered unnecessary. From this it will be apparent that all the essentials necessary to constitute a concluded agreement of lease were contained in the advertisement, bid and acceptance, and that the element of indefiniteness was such that it was capable of being made definite by reference to former course of dealing or the customs of the district.

In Bish. Cont., § 322, it is said: "If one makes to another an offer, verbal or written direct, by letter or by telegram, of a sort implying nothing to be done except to assent or decline, and the latter accepts it, adding no qualification, there is thus constituted a mutual consent of the same thing at the same time — in other words, a contract." In support of this elementary proposition, see *Smith v. Colby*, 136 Mass. 562; *Cheney v. Transportation Line*, 59 Md. 557; *Highland Co. v. Rhoades*, 26 Ohio St. 411; *Wells v. Railroad Co.*, 30 Wis. 605; *Abbott v. Shepard*, 48 N. H. 14.

It is contended on the part of defendants that there was no concluded agreement, for the reason that, at the same corporate meeting at which the bid of plaintiff was accepted, there was a subsequent motion passed and entered of record, in which the president was "empowered to draw up the lease, in conjunction with Mr. Cochrane or his agent, and present it to the board of directors for their consideration." This contention cannot prevail: *First*, the language used — "the lease"— presupposes a contract already in existence; *second*, it in no way attempts to modify, qualify or restrict the contract as made and accepted; *third*, the proceeding was *ex parte*, was not communicated to the plaintiff or brought to his notice, appears to have been simply a designation of a party who should represent the defendants in reducing the contract to writing and attending to its execution as the agent of the corporation. Had it been embraced

in the resolution of acceptance, and communicated to the plaintiff, it could in no way have modified the contract, or had the effect claimed by counsel for defendants. The rule is well settled that, where the agreement is made by written communications, it must appear from them, or some of them, and be known to both parties, that the execution of the formal lease was to be a condition precedent to the agreement becoming obligatory.

In *Bonnewell v. Jenkins*, 8 L. R. Ch. Div. 74, decided in 1878 in the court of last resort in England, the same question was presented, but under circumstances far more favorable for the contention of the defendant than those in this, in that the letter of acceptance contained the following: "We are instructed to accept your offer of £800 for these premises, and have asked Mr. Jenkins' solicitor to prepare a contract." In discussing the question, Fry, J., said: "Now, if the matter were not covered by decision, it is very probable that I should feel myself drawn to the conclusion that wherever there is a reference to a future contract the letters themselves do not constitute a contract, and for this very obvious reason: that a reference to a contract as a future thing seems to negative the notion of the existence of a contract as a present thing. But it is too late for that argument to be used before me successfully when a long series of cases has established this proposition: that the mere reference to a future contract is not enough to negative the existence of a present one." Baggallay, L. J., said: "But the letter must be expressed in such a way as to show clearly that such a condition is intended." Thesiger, L. J., said: "The mere reference to the preparation of an agreement by which the terms agreed upon would be put into a more formal shape does not prevent the existence of a binding contract." James, L. J., said: "Whether there is a binding contract or not depends on the construction of two letters. It is settled law that a contract may be made by letters, and that the mere reference in them to a future formal contract will not prevent

their constituting a binding bargain." In that case, Cookson, Q. C., cited and relied upon the same cases cited and relied upon by the defendants in this case, viz., *Ridgway v. Wharton*, 6 H. L. Cas. 238, and *Honeyman v. Marryat*, id. 112. But they were distinguished and disregarded by the court, and a decree for specific performance entered.

The question as to whether the contract was sufficiently definite to be enforced in a suit for specific performance is answered in disposing of the first question, viz., whether there was a concluded contract for lease. The general rule, as above shown, is: "An offer or proposal made by one party, and the acceptance thereof by the other, constitutes a contract; in other words, a contract is thereby concluded so that it may be enforced." Pom. Spec. Perf., § 59. And whenever it is shown that there was a definite and concluded legal contract, it may be enforced by suit for specific performance. There appears no conflict of authority on this point. The leading English cases in support of the positions here taken are: *Kennedy v. Lee*, 3 Mer. 441; *Fowle v. Freeman*, 9 Ves. 351; *Bonnewell v. Jenkins, supra.* See, also, the following cases in England: *Crossley v. Maycock*, 18 L. R. Eq. 180; *Thomas v. Dering*, 1 Keen, 729; *Gibbins v. Board*, 11 Beav. 1; *Skinner v. McDouall*, 2 De Gex & S. 265; *Jaques v. Millar*, 6 L. R. Ch. Div. 153. And in the United States, *Pratt v. Railroad Co.*, 21 N. Y. 305, in which it was said by Selden, J.: "If two parties negotiate for a lease of certain premises, and they agree upon the terms and conditions of the lease, and that a written lease shall be drawn and executed embracing those terms, this is not a lease, but it is a contract which, whenever the statute of frauds does not interfere to prevent, can be enforced, and which the courts will compel the parties specifically to perform. The books are full of such cases, and it can hardly be necessary to refer to them at length." See, also, *Mackey v. Mackey*, 29 Grat. 158; *Cheney v. Transportation Line, supra; Wharton v. Stoutenburgh*, 35 N. J. Eq. 266; *Blaney v. Hoke*, 14 Ohio St. 292; *Clark v. Clark*, 49 Cal. 586.

Our conclusion is that the acts of the parties in the premises constituted·a definite and concluded agreement for a lease, and that there was nothing that could not have been made definite and certain by means of knowledge and *data* in the possession of the parties, and that it was so considered by the defendants at the time of the corporate acceptance of the offer.  It is true, as contended by counsel, that there is a material difference between an unaccepted proposal and a binding agreement, between negotiations preparatory to an agreement and the agreement itself; but counsel seem to confound the concluded agreement or contract of lease with the written document to be drawn subsequently and executed by the parties, which paper in this case could only be evidence of the contract concluded at the time of the corporate acceptance.

Counsel have briefed and argued the case of defendants with great care and ability, have collected and cited a large number of authorities, which we have carefully examined, and we fully agree with counsel when they frankly say: " It may be that none of the cases cited above are exactly parallel to the present case, but they are the nearest that we have been able to find."  There was no want of diligence.  The trouble is, when applied to the premises in this case, the great weight of authority is overwhelmingly against the position sought to be sustained.

The remaining question is whether the plaintiff or defendants was in fault; in other words, has plaintiff shown himself entitled to the relief asked?  The question is comparatively free from embarrassment.  The offer of defendants to lease by its terms contained the entire mining property; the respective claims were named, and their aggregate is given as twenty-six and eight-tenths acres.  The offer of plaintiff was for the entire property.  No lease of the entire mining property was ever tendered; the "Crowe shaft" with surface ground was excepted and reserved for a part of the term.  It is conceded that it had at the time of the contract been leased to other parties.  It is claimed by de-

fendants that the fact was known to plaintiff at the time of making the contract. This fact cannot prevail as a defense. The knowledge on the part of plaintiff, if it existed, would not relieve defendants from the necessity of complying with their contract. It is also contended that the suit could not be maintained because of the inability of defendants to perform by reason of having leased the Crowe shaft previous to the contract with plaintiff. It appears that, between the date of the advertisement for bids and the awarding of the lease to plaintiff, defendants had leased part of the property to other parties, and had also leased the boarding-house used with the property. It would be sufficient answer to this contention to say that, having already leased to other parties, the exception and reservation of those portions should have been made at the time of making the contract with the plaintiff. Another sufficient reason why it cannot prevail lies in the fact that plaintiff offered to adjust the matter by receiving the rent which was to be paid to the defendants, which offer was refused. The law is well settled that a lessor who cannot fully comply with his contract will not be allowed to set up his own inability to perform as a defense when the lessee is willing to take what can be demised, and compensation for the balance. See Pom. Spec. Perf., § 388, and cases cited. It is obvious that under the agreement plaintiff was entitled to the entire mining property, including the Crowe shaft, or the income from the portions leased. We leave the question of the boarding-house out of the discussion, for, although claimed by plaintiff as a part of the property to which he was entitled, it was not specifically mentioned in the papers constituting the agreement. The offer of plaintiff, as accepted by defendants, as before shown, contained the following: " And agrees to expend under the best management obtainable at least $5,000 each and every month during life of lease in development work." The lease tendered by defendants and refused by plaintiff contained the following: " To sink a shaft upon the Justice

or Monte Cristo claims aforesaid, from the surface, at or near the east end line of said Justice claim, and near the west side line of the Last Dollar lode claim, adjoining said Justice, upon the easterly side line of said Justice. Said Justice and Monte Cristo claims overlap each other at or about the place said shaft is to be sunk, and the location of same is to be mutually agreed upon by the president, vice-president and secretary of the Justice Mining Company, and the lessee herein." And after elaborate specifications in regard to size and construction of shaft, timbering of the same, etc., proceeds: " Said shaft to be sunk no less than six hundred (600) feet in depth from the surface; provided, however, that mineral in place and in paying quantities be not discovered before said depth shall have been reached, in which event said lessee may drift on the same in any direction within the boundaries of the premises leased; provided, however, that the lessee shall sink said shaft to the depth aforesaid — that is, six hundred (600) feet — even if mineral be discovered before said depth is reached."

The offer of plaintiff must be construed to mean the expenditure of the money in development in such a manner as to produce ore during the existence of the lease, and thus benefit both parties. He cannot be reasonably understood as offering to expend his money in a way that would only inure to the benefit of the lessor. The provision for the expenditure of a large amount of money in sinking a shaft at a point designated by the lessor, and to a given depth, regardless of its utility in the production of ore, was arbitrary, and certainly not contemplated in the offer. The sinking of the shaft at the point designated to the " contact " or ore body might be proper and mutually beneficial, but the same cannot be said of its extension an indefinite distance in barren rock, which could not add to the ore product during the lease, and could only add to the value of the property of the lessor. The lease tendered also contained the following: " Shall use his best ability and endeavors to obtain the best price for all ores mined under this lease,

and to handle and dispose of the same to the best possible
advantage of both parties hereto, and the lessor shall have
the right to co-operate with the lessee for the purposes
aforesaid; and whenever the lessor can procure better
terms as to treatment and sale of the ores mined than the
lessee, the lessor shall have the right to dispose of the ore
so as to realize greater profit to the lessor and lessee."
Such a provision was certainly not contemplated,— the res-
ervation of a power certainly unusual, if not unheard of,
in that class of leases; a provision incompatible with the
relations of the parties to the property, and as destructive
of the rights of the lessee as would have been a covenant
allowing the lessor to take possession of the property and
work it whenever in the judgment of its officers it could do
so to better advantage than the lessee. It is claimed, and
not without reason, that the provisions allowing no deduc-
tion for expense of delivering the ore from the mines to
Aspen, the requiring the lessee to pay sixty-five per cent.
of the taxes upon the property, and some other provisions
contained, were harsh, arbitrary and oppressive, not con-
templated in the contract, and unusual in mining leases;
but a discussion of them seems unnecessary. The lease
drawn and tendered by defendants was refused by plaintiff.
One was drawn and tendered by plaintiff, in which, as
shown by the evidence and a perusal of the lease, many
concessions on the part of plaintiff were made with a view
to closing the matter, and the lease was rejected by the de-
fendants. In the letter of plaintiff transmitting the draft
of the lease, after saying in regard to the lease sent him by
the defendants to be executed: "It has many clauses in it
that I never agreed to, and which are unreasonable and un-
fair,"— he proceeds to say: "I have had a lease drawn
which covers my offer, which you accepted. I believe it is
fair to both sides. If it does not comply with my offer it
is a mistake, and I am ready to correct it, to agree in every
respect with my offer." This was written on March 29th.
No notice of it appears to have been taken on the part of

defendants, no attempt to arrive at a proper determination of the matter. On April 12th the following was sent by defendants to plaintiff:

"*To Frank T. Cochrane:* You are hereby notified that, owing to your failure to execute and return to this company the lease heretofore sent you on or about the 21st day of March, and to be executed by you and returned to this company on or before the 1st day of April, 1889, the undersigned, the Justice Mining Company, hereby withdraws and rescinds said lease tendered for your acceptance, and rescinds and holds for naught all negotiations and offers heretofore conducted and made concerning the leasing of the property of said company to you, and holds and declares itself free from any and all obligations to you in the premises. Witness the seal of the company and the signatures of its president and secretary this 9th day of April, A. D. 1889. PETER LUX, President. J. W. RICHARDS, Secretary. [Justice Mining Co. Seal. Aspen, Colo.]"

Comment upon this document is unnecessary. The failure to execute the lease sent by defendants to plaintiff is made the basis of abrogating and rescinding the contract, and the closing of all negotiations concerning it.

It will be apparent that no effort was made on the part of the defendant to comply with its contract; and if it does not show an intention to avoid the agreement, it certainly shows no attempt or desire to comply with it. We think the court erred in dismissing the suit, and that a decree for specific performance should have been allowed, and advise that the judgment be reversed.

RICHMOND, C.: I concur.

BISSELL, C.: I dissent.

PER CURIAM. For the reasons stated in the foregoing opinion the judgment is reversed.

*Reversed.*

Mr. Justice Hayt (*dissenting*).  A decree for the specific performance of a contract is sought in this action. The contract is alleged to have been entered into between appellant and appellees upon March 18, 1889.  The controversy turns almost entirely upon a bid made by plaintiff in error, Cochrane, for a lease upon a certain mining property, and the action of the board of directors of the Justice Mining Company taken thereon.  The bid is as follows: " (3) I will take lease on the whole property at thirty-five per cent. royalty at eighteen (18) months, and agree to expend, under the best management obtainable, at least $5,000 each and every month during life of lease in development work, I to have thirty (30) days to begin work, in order to make an examination of property, and put machinery in place.  Lease to date from time of commencing work.  Settlements as usual.  [Signed]  Frank T. Cochrane & Co."

The action of the board of directors relied upon to bind the company was taken upon March 18, 1889, and is evidenced by the following entry upon records of the company: "Moved and carried that Frank T. Cochrane & Company's proposition for lease on three sections of the Justice property, according to the terms of paragraph 3, be accepted.

"Moved and carried that all other bids be rejected.

"Moved and carried that the president be empowered to draw up the lease, in conjunction with Mr. Cochrane or his agent, and present it to the board of directors for their consideration."

Shortly thereafter a lease was prepared, satisfactory to the company, and forwarded to plaintiff in error for his acceptance.  This lease Mr. Cochrane would not accept. He in turn prepared a lease, which the company refused to sign, and, the parties not being able to agree upon the terms of the lease, Mr. Cochran brought this suit to enforce the specific performance of the alleged contract, and compel the company to execute a lease to him in accordance therewith.

About the time of the meeting of the board of directors at which the foregoing resolutions were adopted, and before plaintiff in error was notified of the action taken by the company, he caused to be sent to the president of the Justice Mining Company, then at Aspen, the following telegram: "Peter Lux: Hold my bids for leases until arrival of John Beach, Tuesday.  F. T. COCHRANE."

This telegram, which was delivered before appellant received notice of the action of the board of directors, was immediately supplemented by the following letter: "Denver, March 18, 1889.  Peter Lux, Esq., Aspen — Dear Sir: Please allow Mr. John Beach to correct my bids for leases, and add to them as he sees fit, as I have now some information that I did not have when I made them.  He will return to you at once.  Yours truly, F. T. COCHRANE." The language of the concluding clause · of the resolutions of the board of directors relied upon as binding the company shows quite plainly that further action was contemplated by the board before any contract was to be entered into.  The president of the company was not authorized to execute the lease with Mr. Cochrane.  He was only authorized to draw up the lease in conjunction with Mr. Cochrane or his agent, and submit the same "to the board of directors for their consideration."  It is unreasonable to suppose that it was to be submitted to the consideration of the board of directors with no power reserved in that body to change its terms.  It is more reasonable and natural to conclude from the language employed that further action was to be taken by the company before it should be definitely and irrevocably bound.

In view of this resolution and the telegram and letter from Cochrane, it may well be doubted if the court below was not right in holding that there was no contract concluded between the parties.  But should we concede the contrary, this would not, in my opinion, change the result; the bid and its acceptance not being sufficiently definite and certain to admit of a decree for specific performance.

Take, for instance, the item of thirty-five per cent. royalty. Is this percentage to be based upon the gross output of the mines, after deducting transportation and smelting charges, or transportation charges only, or was the lessee to pay both? These are matters of considerable magnitude, and they are left in uncertainty, with no *data* by which they may be determined. So, also, in the matter relied upon as constituting an agreement, there is nothing fixed as to the place where the development work is to be expended, and nothing whatever as to the nature or character of such work.

In reference to the item of royalty the learned judge who tried the case below well said: " This is always a matter of convention between the parties. Settlement on smelter returns in the mining camp where the property is situated, so far as our observation has gone, is always the subject of convention between the parties. In some instances the lessee pays the cost of transportation from the mine to the railroad and from the railroad tô the smelter. Sometimes he is only required to pay transportation from the mine to the railroad." In this connection it should be added that the words "settlements as usual" evidently refer to the time only at which settlements were to be made.

Upon the items mentioned, and many others, there is a wide, and apparently an honest, disagreement between appellant and appellees. There are some eighteen points of difference between the two leases,—the one submitted by the company and the one prepared by Mr. Cochrane. It should not be a matter of surprise, under the circumstances, that the court below, after patiently listening to the evidence, reached the conclusion that a decree for specific performance was not warranted. The evidence offered is not sufficient, in my judgment, to establish the terms of a contract with anything like the definiteness and certainty required to warrant a decree for specific performance, and the judgment of the trial court should therefore be affirmed.

*Reversed.*